[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 18, 2003
THOMAS K. KAHN
CLERK

Nos. 00-13657 and 00-14859

D.C. Docket No. 98-00052-CR-ORL-19C

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WILLIAM J. McCORKLE,
a.k.a. William T. McCokle

Defendant,

F. LEE BAILEY,

Claimant-Appellant.

Appeals from the United States District Court
for the Middle District of Florida

**(February 18, 2003)**

Before TJOFLAT, RONEY and COX, Circuit Judges.

TJOFLAT, Circuit Judge:


I.

After finding William and Chantal McCorkle guilty of laundering the proceeds of a fraudulent telemarketing scheme,[1] the jury returned a special verdict forfeiting to the United States the McCorkles' interests in various assets. Among these assets were $2 million that had been placed in trust by the McCorkles in the Cayman Islands for the payment of their lawyers' fees and transferred by the trust to F. Lee Bailey, William McCorkle's attorney.[2] At the January 25, 1999

---

[1]The jury convicted the McCorkles (and others involved) of executing a telemarketing scheme in violation of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud), of conspiring to launder the proceeds of the scheme in violation of 18 U.S.C. § 1956(h), and of laundering such proceeds in violation of 18 U.S.C. §§1956(a)(2)(B) and 1957(a). The telemarketing scheme is described in our opinion in United States v. McCorkle, 296 F.3d 1284, 1286-89 (11th Cir. 2002), which affirmed the McCorkles' convictions. Although we vacated the McCorkles' sentences and remanded the case for resentencing, id. at 1294, we left intact the order of forfeiture, since the errors the court committed in imposing sentence had no bearing on the forfeiture aspects of the case.

[2]These $2 million were proceeds of the telemarketing scheme and thus were subject to forfeiture under 18 U.S.C. § 982(a)(1), which states, in pertinent part:
> The court, in imposing sentence on a person convicted of an offense in violation of . . . [18 U.S.C. §§ 1956 or 1957] shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

The seizure of property forfeited under § 982(a)(1) and any judicial proceeding relating to the forfeiture are governed by 21 U.S.C. § 853 and (e)-(p). 18 U.S.C. § 982(b)(1). Under section 853(c), the McCorkles' interest in the proceeds of the telemarketing scheme vested in the United States the moment they laundered such proceeds. A transferee of laundered proceeds may be

2

sentencing, the district court, as a part of the McCorkles' sentencing package, entered an order of forfeiture which conveyed such interests to the United States.

The jury, in returning its forfeiture verdict, found that Bailey was a transferee of the laundered proceeds that belonged to the Unite States. To defeat the Government's right to such proceeds – that is, to avoid being sued by the Government for conversion of its property – Bailey had to file a petition with the district court and prove that he had received the money as a bona fide purchaser for value without cause to believe that the money was subject to forfeiture ("BFP"). See 21 U.S.C. §§853(n)(6)(B). Bailey filed his petition on February 16, 1999.

The district court referred Bailey's petition to a magistrate judge. On March 5, 1999, the Government moved the court for an order to show cause why Bailey should not be held in civil contempt for failing to turn over the funds withdrawn

---

subject fo a "special verdict of forfeiture" (returned at the defendant's trial) and ordered to forfeit such proceeds to the United States, "unless the transferee establishes in a hearing pursuant to [21 U.S.C. § 853(n)(6)(B)] that "he is a bona fide purchaser for value of such property who at the time of the purchase was reasonably without cause to believe that the property was subject to forfeiture under [18 U.S.C. § 982(a)(1) and 21 U.S.C. § 853]." 21 U.S.C. § 853(c). In this case, the jury returned a special verdict of forfeiture with respect to the "$2 million in legal trust fund [created by the McCorkles] and transferred from the trust to F. Lee Bailey." In returning this special verdict, the jury necessarily found (1) that the McCorkles had transferred $2 million of laundered proceeds to the "legal trust fund," which they had set up to pay Bailey's fees (and those of other attorneys) and (2) that the trustees had, in turn, transferred such proceeds to Bailey.

from the trust.[3]  On March 30, 1999, the magistrate judge, in advance of the hearing on the merits of Bailey's section 853(n) petition, entered a preliminary order in which he addressed the Government's motion.  He ordered Bailey to either deposit $2 million into the registry of the court or, by May 3, 1999, post a $2 million bond.  Bailey did neither.

On October 18, 1999, the magistrate judge held a hearing to adjudicate the merits of Bailey's petition and to permit Bailey to show cause why he should not be cited for contempt for failing to comply with the March 20 order.  On January 14, 2000, the magistrate judge forwarded his report and recommendation to the district court.  He recommended that the court reject Bailey's section 853(n)

---

[3]On December 16, 1998, the district court, acting pursuant to Fed. R. Crim. P. 32(d), entered a preliminary order of forfeiture, which authorized the Attorney General to seize the forfeited assets.  A December 18, 1998 order directed the U.S. Marshal to "seize the $2 million in legal trust fund and transferred from trust to F. Lee Bailey."  The Marshal served the order on Bailey on January 15, 1999, but Bailey refused to turn over the funds, stating that "he did not have the money."

By this time, Bailey had instructed the trustees of the fund to disburse $1,94,301 from the trust fund.  About half went to Bailey and his wife; the other half went to the other defense lawyers.  These disbursements were apparently in violation of the magistrate judge's admonishment, when the McCorkles made their initial appearance (following indictment) on March 10, 1997, that no money was to be removed from the trust pending the completion of the criminal forfeiture proceedings.  The Government was not without recourse, however, because the forfeiture statute allows the Government to recover, in the course of an ancillary third-party proceeding, all assets that are traceable to the forfeited assets.  See 21 U.S.C. § 853(c).  Moreover, as the district court noted in its June 29, 2000 order regarding Bailey's section 853(n) petition, the final determination that the Government (and not Bailey) had clear title to the trust fund assets enabled the Government to pursue a common law action against Bailey for conversion.

petition on the ground that Bailey had not shown that he was a BFP,[4] and that the court require Bailey to show cause why he should not be held in civil contempt for failing to pay $2 million into the court's registry or, in lieu of the deposit, post a bond.

On June 29, 2000, the district court entered an order adopting the magistrate judge's recommendation that Bailey's petition be denied, thus giving the Government clear title to the $2 million trust fund earmarked for attorney's fees, including the $1,994,301 that had been disbursed as Bailey directed. The court also agreed that Bailey should be required to show cause why he should not be held in contempt, and it scheduled a hearing for August 17, 2000. Meanwhile, the court reduced to $700,000 the amount of the bond the magistrate judge had

---

[4]We note that the BFP standard requires that transferees of forfeited property interests, such as defense attorneys, be "bona fide purchaser[s] for value of the right, title, or interest in the property." 21 U.S.C. § 852(n)(6)(B). This means that the only assets that are potentially immunized from forfeiture are those for which *value has been given*. The "value" given by an attorney is the performance of legal services that have already been rendered when the attorney receives payment. This case does not present a close question, because the approximately $2 million paid to Bailey was paid for the rendition of *future* legal services.

The point is this: a criminal defendant cannot pay an attorney for the rendition of future legal services with the expectation that the entire payment will be immune from forfeiture. Rather, the court would have to pro rate the value of services that have been rendered by the attorney, immunizing from forfeiture only those fees earned while meeting the BFP test. For example, if an attorney receives an up-front payment of $5 million for his future legal services and the attorney loses his BFP status a week later (say, because the client is indicated and the attorney learns additional information about his client's guilt), the attorney may keep only the reasonable value of his services prior to losing his BFP status; he may not keep the entire $5 million.

required Bailey to post; the court found that $1,300,000 of the trust fund had been dissipated and that the bond "should be reduced to reflect and amount that the Government may still be able to lawfully seize from Mr. Bailey in the form of forfeitable property."[5]

At the August 17 show cause hearing, Bailey represented that he lacked the financial ability to post a $700,000 bond. The district court disagreed, and it adjudged him in contempt of court. In its September 14, 200 order memorializing the adjudication, however, the court declined to impose a sanction (such as a fine or incarceration) that would give Bailey the opportunity to purge himself of the contempt. The court reasoned that a bond was no longer needed. Having adjudged Bailey in contempt, though, the court apparently felt that it had to take some action, and it therefore referred him to the Florida Bar for consideration of disciplinary action.

Bailey now separately appeals (1) the denial of his section 853(n) petition and (2) the contempt adjudication. We consider his appeals in order.

---

[5]The "forfeitable property" in the hands of a transferee, according to the district court's interpretation of 21 U.S.C. § 853(p), includes only the property that is directly "traceable" to the tainted funds and not "substitute" assets. Thus, to reach a third-party transferee's substitute assets, the Government is left to a common law action for conversion; the criminal forfeiture proceeding cannot be used to recover the forfeited interests.

II.

It is clear that the McCorkles used $2 million in laundered, and therefore forfeitable, funds to create the trust fund for payment of attorney's fees. It is also clear that Bailey knew from the outset that the funds were subject to forfeiture. Assuming that he cannot meet the BFP test of 21 U.S.C. § 853(n)(6)(B), Bailey contends that he should be able to keep the money because the Government's conduct induced him to provide legal services that he would not have provided had he known that the Government intended to pursue the money. Specifically, Bailey contends that the Government sent him seven "signals" that he was entitled to the otherwise forfeitable money,[6] and that the signals "would have inclined any reasonable lawyer to believe that he or she was safe and legally correct in receiving and spending funds from the 'defense fund.' " Therefore, Bailey argues,

---

[6]The "signals" Bailey recites are as follows: (1) the Government failed to seek pre-indictment injunctive relief (to freeze the McCorkles' bank accounts) on May 9, 1997; (2) the Government failed to file a petition for injunctive relief on May 12, 1997, and no restraint was immediately sought in the Cayman Islands (although the Government eventually sought to freeze the McCorkles' Cayman Island accounts); (3) after the Cayman Islands trial court ruled that the trust fund could be used to pay costs relating to the Cayman litigation, the Government did not oppose the ruling; (4) Assistant U.S. Attorney DeMarco told Mark Horwitz, Chantal McCorkle's lawyer, that the Government would not be seeking forfeiture of the trust fund; (5) the Government failed to pursue several available options after the Cayman Islands appellate court affirmed the trial court's ruling, such as filing an appeal with the Privy Council in London or seeking a restraining order in the district court; (6) the Government neglected to seek a court order prohibiting defense counsel from obtaining fees from the trust fund prior to the McCorkles' eight week trial; and (7) Assistant U.S. Attorney Byron, the Government's lead prosecutor, allegedly told Horwitz that he knew that transfers were being made from the trust fund but said nothing about the Government's intent to seek their forfeiture.

7

the Government should be estopped from claiming those funds.

Even if Bailey were permitted, as a matter of law, to invoke the estoppel doctrine in this criminal forfeiture context, he has not established the elements of estoppel. To make out a claim of estoppel against the Government, a party must adduce evidence of the following: (1) words, conduct, or acquiescence that induces reliance; (2) willfulness or negligence with regard to the acts, conduct, or acquiescence; (3) detrimental reliance; and (4) affirmative misconduct by the Government. See Tefel v. Reno, 180 F.3d 1286, 1302-04 (11th Cir. 1999). Affirmative misconduct requires more than governmental negligence or inaction; otherwise, prong two and prong four would be redundant.

Most of the "signals" to which Bailey points could not possibly have induced reasonable reliance. Signals one, two, three, five, and six (five of the seven signals asserted by Bailey) focus upon the Government's failure to seek injunctive relief at various times. This is an odd argument, because the statutory scheme expressly grants the Government *discretion* whether to employ the protective measures Bailey says should have been employed. See 21 U.S.C. § 853(e); cf. Caplin & Drysdale v. United States, 491 U.S. 617, 622-23, 109 S. Ct. 2646, 2650-51, 105 L. Ed. 2d 528 (1989) (concluding that a district court's exercise of discretion not to enter a pretrial restraining order does not "

'immunize' nonrestrained assets from subsequent forfeiture under § 853(c), if they are transferred to an attorney to pay legal fees"). Moreover, Government inaction does not give rise to an estoppel claim; the Government must engage in affirmative misconduct. See Tefel, 180 F.3d at 1303-04. Bailey's "signal seven" – the Government's failure to warn defense counsel that it would seek forfeiture upon a conviction – does not give rise to an estoppel claim for the same reason.

This leaves "signal four," in which Bailey asserts that prosecutor DeMarco represented to Horwitz – either explicitly or implicitly – that the Government would not seek forfeiture. Even if this were true, it would only fulfill the first element of an estoppel claim – namely, conduct that induces reliance. It certainly does not meet the requirement that Bailey demonstrate affirmative misconduct by the Government. See Montana v. Kennedy, 366 U.S. 308, 314-15, 81 S. Ct. 1336, 1340-41, 6 L. Ed. 2d 313 (1961). There, the Court considered a case in which a Government official erroneously advised the petitioner's mother that she could not return to the United States from abroad because she was pregnant, thus causing petitioner to be born outside of the United States – a fact later crucial in denying the petitioner citizenship. The Court held that this conduct fell "far short" of the affirmative conduct that might justify estoppel.

Finally, Bailey has not shown that the district court committed clear error

9

when it found that he could not have reasonably relied upon the Government's signals in light of the many counter-signals by the Government, the magistrate judge, and the district court that forfeiture would be sought. On March 10, 1998, when the McCorkles made their initial appearance before the magistrate judge, for example, prosecutor Byron told Bailey: "In terms of whether or not the asset forfeiture unit of the U.S. Attorney's Office would agree to give money up to which they have a claim, I certainly cannot speak for that although I am happy to put counsel in contact with the appropriate authority to make that kind of representation." Thus, Byron made clear that he did not have authority to abandon a claim of forfeiture – a claim sought from the very beginning. Similarly, the magistrate judge made clear to Bailey at the bail hearing the next day that the ownership of the trust fund was disputed and potentially forfeitable when he said: "I'm sure no counsel of record would do anything to transfer away any portion of that two million dollar attorney fund . . . until we've had a chance to make a determination on that." The judge ultimately found that the United States "has always actively sought forfeiture of the $2,000,000 fund" and that Bailey's claim of detrimental reliance was "not credible." This finding of fact is not clearly erroneous. See Marine Transp. Serv. Sea-Barge Group v. Python High Perf. Marine Corp., 16 F.3d 1133, 1138 (11th Cir. 1994) (noting that the constituent

elements of an equitable estoppel claim are questions of fact that can be reversed only upon a showing of clear error).

In sum, we affirm the district court's denial of Bailey's section 853(n) petition. We now turn to the contempt adjudication.

III.

The magistrate judge ordered Bailey to deposit $2 million into the court's registry or post a bond in that amount pending adjudication of his section 853(n) petition. Bailey failed to comply with the court's order. The judge thereafter recommended that the district court order Bailey to show cause why he should not be held in contempt. The district court agreed and ordered Bailey to show cause for the disobedience; the court, however, modified the magistrate judge's order, requiring Bailey to post a $700,000 bond. Bailey did not post the bond. At the show cause hearing, the district court found unacceptable Bailey's reasons for his noncompliance, and it therefore adjudged him in "contempt." The court did not, however, impose an on-going coercive sanction that would have given Bailey the chance to purge himself of the contempt. Instead, the court found that the bond would serve no purpose and that Bailey's only "sanction" would be the court's

referral of Bailey to the Florida Bar for disciplinary proceedings.[7]

A mere reprimand and referral to a state bar disciplinary committee is not a contempt adjudication. The Supreme Court described a valid contempt order in International Union, UMWA v. Bagwell:

> Criminal contempt is a crime in the ordinary sense, and criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings. . . . In contrast, civil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary proceeding . . . . [A] contempt sanction is considered civil if it is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court.

512 U.S. 821-28, 114 S. Ct. 2552-56, 129 L. Ed. 2d 642 (1994) (internal quotes and citations omitted). In sum, the line between civil and criminal contempt is that the former consists of a sanction designed to compensate a party or coerce future action; the latter entails punishment in the name of vindicating the court's authority. See also 17 C.J.S. § 64 (1999).

In this case, the court did not impose a coercive sanction. Indeed, the district court did not impose any sanction at all – the court's theory being that posting a bond would serve no purpose. We are at a loss as to how a party can be

---

[7]The court's basis for this conclusion was its belief that the Government was not making a good faith attempt to acquire the forfeitable assets.

adjudged in civil contempt when the underlying basis for the contempt citation is moot. Clearly the court meant only to reprimand Bailey for his past conduct. We accept Bailey's recent concession that the district court's order is not an appealable judgment of contempt. The appeal of the contempt adjudication is therefore dismissed for lack of an appealable order. We reach the merits only as to the district court's denial of Bailey's section 853(n) petition. That decision is

AFFIRMED.