[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 9, 2005
THOMAS K. KAHN
CLERK

_____

No. 03-16445

_____

D. C. Docket No. 01-00875-CV-ORL-22

UNITED STATES OF AMERICA,

Plaintiff-Appellant
Cross-Appellee,

versus

F. LEE BAILEY,

Defendant-Appellee
Cross-Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

**(August 9, 2005)**

Before EDMONDSON, Chief Judge, and TJOFLAT and KRAVITCH, Circuit
Judges.

TJOFLAT, Circuit Judge:

## I.

The instant case is a civil action for conversion and civil theft brought by

the United States against F. Lee Bailey.  This case has its origins in a criminal

prosecution in which Bailey served as defense counsel.  The facts of that case that

are relevant here are recounted in our opinion in United States v. McCorkle, 321

F.3d 1292 (11th Cir. 2003):

> [On November 4, 1998,] [a]fter finding William and Chantal
> McCorkle guilty of laundering proceeds of a fraudulent telemarketing
> scheme, the jury returned a special verdict forfeiting to the United
> States the McCorkles' interests in various assets.  Among these assets
> were $2 million that had been placed in trust by the McCorkles in the
> Cayman Islands for the payment of their lawyers' fees and transferred
> by trust to F. Lee Bailey, William McCorkle's attorney.  At the
> January 25, 1999 sentencing, the district court . . . entered an order of
> forfeiture which conveyed such interests to the United States.
>     The jury, in returning its forfeiture verdict, found that Bailey
> was a transferee of the laundered proceeds that belonged to the
> United States.  To defeat the Government's right to such proceeds . . .
> Bailey had to file a petition with the district court and prove that he
> had received the money as a bona fide purchaser for value without
> cause to believe that the money was subject to forfeiture ("BFP").
> See 21 U.S.C. §[] 853(n)(6)(B). Bailey filed his petition on February
> 16, 1999.
>     The district court referred Bailey's petition to a magistrate
> judge.  On March 5, 1999, the Government moved the court for an
> order to show cause why Bailey should not be held in civil contempt
> for failing to turn over the funds withdrawn from the trust.  On March
> 30, 1999, the magistrate judge, in advance of the hearing on the
> merits of Bailey's . . . petition, entered a preliminary order in which
> he addressed the Government's motion.  He ordered Bailey to either

> deposit $2 million into the registry of the court or, by May 3, 1999, post a $2 million bond. Bailey did neither.

Id. at 1294-95 (footnotes omitted). Apparently, Bailey "did neither" because the trust fund was nearly empty; by October 1998, Bailey had disbursed its contents to himself and the McCorkles' other lawyers as legal fees for the McCorkles' defense. Id. at 1295 n.3; United States v. Bailey, 288 F. Supp. 2d 1261, 1265 (M.D. Fla. 2003).

In October 1999, the magistrate judge conducted an extensive evidentiary hearing on the merits of Bailey's petition and on Bailey's failure to comply with the preliminary order to either deposit the $2 million with the court or post bond. In January 2000, the magistrate judge recommended (1) that the district court deny Bailey's petition because Bailey had failed to establish that he was a BFP and (2) that the court require Bailey to show cause why he should not be held in civil contempt for failing to comply with the magistrate judge's preliminary order. McCorkle, 321 F.3d at 1295. "On June 29, 2000, the district court entered an order adopting the magistrate judge's recommendation that Bailey's petition be denied, thus giving the Government clear title to the $2 million trust fund earmarked for legal fees . . . ." Id. at 1295-96. However, the court also concluded that it lacked the statutory authority to order Bailey to forfeit $2 million because

3

that trust fund was no longer available.  Bailey, 288 F. Supp. 2d at 1263.[1]  As an alternative, the district court suggested (as did this court on appeal) that "the final determination that the Government (and not Bailey) had clear title to the trust fund assets enabled the Government to pursue a common law action against Bailey for conversion."  McCorkle, 321 F.3d at 1295 n.3.

On July 24, 2001, the Government filed suit against Bailey.  The complaint alleged conversion and civil theft and sought the entire $2 million from the trust fund, punitive damages on the conversion count, and treble damages on the civil theft count.  See Fla. Stat. § 772.11(1) ("Any person who proves by clear and convincing evidence that he or she has been injured in any fashion by [civil theft]

---

[1] Under 21 U.S.C. § 853(c), "[a]ll right, title, and interest" in the property subject to forfeiture in the McCorkle case, including the legal trust fund, "vest[ed] in the United States upon the commission of the act giving rise to forfeiture," i.e., the McCorkles' laundering of the proceeds of their fraudulent telemarketing scheme.  That subsection further provides that
> [a]ny such property that is subsequently transferred to a person other than the defendant may be the subject of a special verdict of forfeiture and thereafter shall be ordered forfeited to the United States, unless the transferee establishes . . . that he is a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture under this section.

In the forfeiture proceeding the district court held that Bailey had not established that he was a BFP, and we affirmed this ruling on appeal.  McCorkle, 321 F.3d at 1298.  Accordingly, the legal trust fund was subject to forfeiture.  But because the fund's contents had been disbursed to pay for the McCorkles' defense, the fund could not be ordered forfeited.  And although 21 U.S.C. § 853(p) provides that under certain circumstances the Government may seek forfeiture of "substitute property" of the defendant himself, the statute does not authorize the Government to recover substitute assets of a third party, such as Bailey, who has dissipated property that would otherwise be subject to forfeiture.

4

has a cause of action for threefold the actual damages sustained . . . ."). Prior to trial, the district court granted partial summary judgment in favor of the Government. It concluded that as a result of the "relation-back doctrine," as codified in 21 U.S.C. § 853(c), see supra note 1, the Government acquired all right, title, and interest in the money comprising the trust fund the moment that it was laundered by the McCorkles in violation of federal law, and that Bailey, therefore, necessarily converted the fund when he disbursed it to himself and the McCorkles' other attorneys. Bailey, 288 F. Supp. 2d at 1265-66. As such, it granted the Government's motion for summary judgment on the conversion claim, and that claim proceeded to trial on the issue of punitive damages only. It also ordered that the civil theft claim would go to trial only on the issue of intent, i.e., whether Bailey obtained the contents of the fund "with the felonious intent to commit a theft." Id. at 1266.

After a four-day trial, a jury awarded the Government $3 million in punitive damages on the conversion claim and also found against Bailey on the civil theft claim, which resulted in a trebled award of $6 million. Bailey then moved for reconsideration of the court's decision granting summary judgment and to set aside the punitive damage award as unconstitutional under State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003).

5

The court granted Bailey's motion for reconsideration, vacated its earlier order granting partial summary judgment in favor of the Government, and entered judgment as a matter of law in favor of Bailey on both of the Government's claims. Bailey, 288 F. Supp. 2d at 1281-82. Its order was based on a reevaluation of its earlier ruling regarding the relation-back provision of § 853(c) and the state-law tort requirement that a plaintiff in a suit for conversion or civil theft must establish possession or a right to immediate possession at the time of the alleged conversion. Specifically, the court now held that the Government could not rely exclusively on the relation-back doctrine to establish such a possessory interest. See id. at 1267-79. "[I]n the interests of judicial economy," the court also considered Bailey's alternative argument regarding punitive damages, id. at 1279, and held that a $3 million punitive award was unconstitutionally excessive under the Campbell due process analysis. See id. at 1279-81.

On appeal, the Government argues that the district court erred in holding that it lacked the requisite possessory interest in the legal trust fund at the time of the alleged conversion.[2] The Government also challenges the district court's order

---

[2] Possession or an immediate right to it is a prerequisite to an action for either conversion or civil theft. See, e.g., In re Gen. Plastics Corp., 158 B.R. 258, 287 (Bkrtcy. S.D. Fla. 1993) (In Florida, "a necessary element of both common law conversion and statutory civil theft is that the plaintiff must have had a 'present or immediate right to possession' of the allegedly converted property at the time of the conversion." (quoting Page v. Matthews, 386 So. 2d 815, 816 (Fla. 5th DCA 1980), and Allen v. C.I.T. Credit Corp., 133 So. 2d 442, 445-46 (Fla. 1st DCA 1961)).

setting aside the jury's punitive damage award. Because we affirm the district court on the former issue, we do not address the issue of punitive damages.

## II.

### A.

Under Florida law, a plaintiff in an action for conversion or civil theft must establish possession or an immediate right to possession of the converted property at the time of the conversion. See infra Part II.B. The Government argues that the relation-back rule codified in 21 U.S.C. § 853(c) satisfies this requirement by retroactively granting it an immediate right of possession at the moment of the unlawful activity giving rise to the forfeiture. In this case, that would mean that the Government's right to possession arose as soon as the McCorkles laundered the funds subsequently used to create the legal trust fund. The statutory provision on which the Government relies states that

> [a]ll right, title, and interest in [the] property . . . vests in the United States upon the commission of the act giving rise to forfeiture under this section. Any such property that is subsequently transferred to a person other than the defendant may be the subject of a special verdict of forfeiture and thereafter shall be ordered forfeited to the United States, unless the transferee establishes . . . that he is a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture under this section.

---

Therefore, our discussion of the issue applies equally to both of the Government's claims.

21 U.S.C. § 853(c).

In Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 109 S. Ct. 2646, 105 L. Ed. 2d 528 (1989), the Court explained the legal effect of this provision:

> As soon as [the possessor of the forfeitable asset committed the violation] of the internal revenue laws, the forfeiture under those laws took effect, and (though needing judicial condemnation to perfect it) operated from that time as a statutory conveyance to the United States of all the right, title and interest then remaining in the [possessor]; and was as valid and effectual, against all the world, as a recorded deed. The right so vested in the United States could not be defeated or impaired by any subsequent dealings of the . . . [possessor].

Id. at 627, 109 S. Ct. at 2653 (quoting United States v. Stowell, 133 U.S. 1, 19, 10 S. Ct. 244, 248, 33 L. Ed. 555 (1890)) (alterations and omissions in Caplin & Drysdale). Two things are notable about this statement of the doctrine. First, the Court referred to the wrongdoer as the "possessor" of the forfeitable assets even though, by operation of the statutory relation-back provision, he had already lost all "right" and "title" in them. Second, although the Court stated that the forfeiture "took effect" at the time of the wrongdoing, it also observed that, like a lienholder, the Government still "need[ed] judicial condemnation to perfect it." See also United States v. 92 Buena Vista Ave., 507 U.S. 111, 125-27 & n.20, 113 S. Ct. 1126, 1135-36 & n.20, 122 L. Ed. 2d 469 (1993) (plurality opinion) (discussing

8

Stowell and Grundy, infra); Stowell, 133 U.S. at 16-17, 10 S. Ct. at 247

("[W]henever a statute enacts that upon the commission of a certain act specific

property used in or connected with that act shall be forfeited, the forfeiture takes

effect immediately upon the commission of the act; the right to the property then

vests in the United States, although their title is not perfected until judicial

condemnation . . . ." (emphasis added)); United States v. Grundy, 7 U.S. (3

Cranch) 337, 350-51, 2 L. Ed. 459 (1806) (Marshall, C.J.) ("It has been proved,

that in all forfeitures accruing at common law, nothing vests in the government

until some legal step shall be taken for the assertion of its right, after which, for

many purposes, the doctrine of relation carries back the title to the commission of

the offence . . . ." (emphasis added)).

Concurring in the judgment in 92 Buena Vista Ave., Justice Scalia gave a

similar account of the doctrine:

> The Government's argument in this case has rested on the
> fundamental misconception that, under the common-law relation-back
> doctrine, all rights and legal title to the property pass to the United
> States "at the moment of illegal use." Because the Government
> believes that the doctrine operates at the time of the illegal act, it
> finds the term "relation back" to be "something of a misnomer." But
> the name of the doctrine is not wrong; the Government's
> understanding of it is. It is a doctrine of retroactive vesting of title
> that operates only upon entry of the judicial order of forfeiture or
> condemnation: "[T]he decree of condemnation when entered relates
> back to the time of the commission of the wrongful acts, and takes

date from the wrongful acts and not from the date of the sentence or decree." Henderson's Distilled Spirits, 14 Wall. 44, 56, 20 L. Ed. 815 (1872). "While, under the statute in question, a judgment of forfeiture relates back to the date of the offense as proved, that result follows only from an effective judgment of condemnation." Motlow v. State ex rel. Koeln, 295 U.S. 97, 99, 55 S. Ct. 661, 662, 79 L. Ed. 1327 (1935). The relation-back rule applies only "in cases where the [Government's] title ha[s] been consummated by seizure, suit, and judgment, or decree of condemnation," Confiscation Cases, 7 Wall. 454, 460, 19 L. Ed. 196 (1869), whereupon "the doctrine of relation carries back the title to the commission of the offense," United States v. Grundy, 3 Cranch 337, 350-351, 2 L. Ed. 459 (1806) (Marshall, C.J.) (emphasis added).

507 U.S. at 131-32, 113 S. Ct. at 1338-39 (Scalia, J., concurring in the judgment) (citations omitted).[3] Justice Scalia then explained that the relation-back provision at issue in that case[4] was "not an unheard-of provision for immediate, undecreed, secret vesting of title in the United States, but rather an expression of the traditional relation-back doctrine—stating when title shall vest if forfeiture is decreed." Id. at 134, 113 S. Ct. at 1340. Therefore, a person holding legal title to an asset and claiming innocent-owner status,[5] is "genuinely the 'owner' . . . []prior

---

[3] There was no majority opinion in 92 Buena Vista Ave. Justice Scalia's concurrence in the judgment, joined by Justice Thomas, was necessary to the Court's 6-3 decision in the case.

[4] The relation-back provision at issue in 92 Buena Vista Ave. was 21 U.S.C. § 881(h), which, similar to § 853(c), provides that "[a]ll right, title, and interest in property [subject to forfeiture] shall vest in the United States upon commission of the act giving rise to forfeiture."

[5] 92 Buena Vista Ave. interpreted 21 U.S.C. § 881(a)(6), which then provided that "no property shall be forfeited under this paragraph to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner." 92 Buena Vista Ave., 507 U.S. at 114 n.1, 113

10

to the decree of forfeiture[] . . . ." Id.

What we take from these cases is that the relation-back doctrine operates retroactively to vest title in the Government effective as of the time of the act giving rise to the forfeiture. That is, it does not "secret[ly]" vest title at the very moment of the act, id., but rather title vests at the time of the court-ordered forfeiture and then relates back to the act. The question we consider below is whether this legal fiction also establishes the "immediate right of possession" that is an element of the state-law torts at issue in this case. See Grundy, 7 U.S. (3 Cranch) at 350-51 (Marshall, C.J.) (stating that "nothing vests in the government" until an order of forfeiture is entered, "after which, for many purposes, the doctrine of relation carries back the title to the commission of the offence" (emphasis added)).

## B.

"In Florida, an action for conversion is regarded as a possessory action and the plaintiff must have a present or immediate right of possession of the property in question." Page v. Matthews, 386 So. 2d 815, 816 (Fla. 5th DCA 1980); see also Star Fruit Co. v. Eagle Lake Growers, 33 So. 2d 858, 860 (Fla. 1948) ("The

---

S. Ct. at 1129 n.1. This language was removed from § 881(a)(6) by the Civil Asset Forfeiture Reform Act of 2000, Pub. L. 106-85, 114 Stat. 202 (2000). The innocent owner defense is now codified at 18 U.S.C. § 983(d).

11

gist of a conversion [is] . . . the wrongful deprivation of a person of property to the possession of which he is entitled." (quoting 53 Am. Jur. <u>Trover and Conversion</u> § 29, at 822)). Thus, according to the <u>Restatement</u>, a converter "is subject to liability to one who at the time was entitled to immediate possession of the chattel." <u>Restatement (Second) of Torts</u> § 225 (1965), <u>quoted in</u> <u>Nat'l Ventures Inc. v. Water Glades 300 Condo. Ass'n</u>, 847 So. 2d 1070, 1073 (Fla. 4th DCA 2003). The comments further explain that "[e]ither the person in possession of the chattel <u>at the time of the conversion</u> or the person <u>then</u> entitled to its immediate possession may recover." <u>Restatement</u>, <u>supra</u>, § 225 cmt. d (emphasis added). The Prosser and Keeton treatise similarly states that "[i]n order to maintain the common law action of trover,[6] the plaintiff must establish that he was in possession of the goods, or entitled to possession, <u>at the time of the conversion</u>." W. Page Keeton et al., <u>Prosser and Keeton on Torts</u> § 15, at 102-03 (5th ed. 1984) (emphasis added), <u>quoted in</u> <u>Nat'l Ventures</u>, <u>supra</u>. "But an owner who [has] neither possession nor the immediate right to it <u>at the time of the conversion</u> [cannot] maintain [an action for] trover." Keeton et al., <u>supra</u>, § 15, at 104

---

[6] The tort of conversion evolved from the "old common law action of trover." W. Page Keeton et al., <u>Prosser and Keeton on Torts</u> § 15, at 89 (5th ed. 1984). Today, the terms are often used interchangeably.

12

(emphasis added).[7]

In contrast, under the "modern view of conversion," it is not absolutely necessary for the plaintiff to establish possession or an immediate right to possession at the time of the alleged conversion; rather, "some property interest in the allegedly converted goods is all that is needed to support an action." In re Marriage of Langham and Kolde, 106 P.3d 212, 219 (Wash. 2005). But because Florida adheres to the common-law formulation of the tort,[8] the question whether the relation-back doctrine retroactively vested "title" or "ownership" in the United States as a matter of state law is of little, if any, importance in this case. The only question is whether the doctrine gave the Government the immediate right to possession—as that term is defined by Florida law—the moment the McCorkles laundered the money that was eventually used to set up their legal trust fund.

The Florida conversion case that is most like the instant case is Ginsberg v. Lennar Fla. Holdings, Inc., 645 So. 2d 490 (Fla. 3rd DCA 1994). In Ginsberg, the

---

[7] Writing in 1984, the treatise's authors criticized the common-law rule that the plaintiff must establish possession or an immediate right to it as "an antique procedural survival, with nothing to recommend it," but they also reported that it "persist[ed] . . . in a good many courts." Keeton et al., supra, § 15, at 104.

[8] The district court, citing numerous cases, correctly concluded that Florida follows the common-law rule rather than the modern view. See Bailey, 288 F. Supp. 2d at 1271-72. For its part, the Government concedes that "under Florida law, a plaintiff must demonstrate . . . possession or an immediate right to possess" the allegedly converted property.

plaintiff/mortgagee alleged that the defendant/mortgagor had converted rents from two mortgaged apartment complexes to which the plaintiff was entitled under Florida law. Id. at 492. The Third District Court of Appeal, however, concluded that the statute only "create[d] a lien on the rents in favor of the mortgagee," and that "[i]n order to reduce that lien to possession, [the mortgagee] was required to foreclose on the lien." Id. at 498 (applying Fla. Stat. § 697.07). And because the plaintiff had not "foreclosed on the lien, . . . it [could not] claim, under the statute, a right to possession of the rents." Ginsberg, 645 So. 2d at 498. That is, the plaintiff could not sue for conversion even assuming (a) that it had a right to enforce its lien as soon as the defendant defaulted and (b) that the default occurred before the alleged conversion. See also Citation Mortgage, Ltd. v. RC of a Retirement Living Ltd., 753 So. 2d 777, 779 (Fla. 5th DCA 2000) (following Ginsberg).

Ginsberg's approach to conversion is consistent with the Florida Supreme Court's older decisions in Meyers v. Ferris, 109 So. 209 (Fla. 1926),[9] and Dekle v.

_____

[9] In Meyers, the plaintiff sued for conversion in her capacity as the administratrix of a Florida estate, alleging that the defendants had converted certain property of the decedent that was located in New York. Meyers, 109 So. at 209-10. Although it appeared that the plaintiff, in her capacity as administratrix, had legal title to the property at the time of the conversion, see id. at 210; id. at 211-12 (Brown, C.J., dissenting), it did not appear that she had a right to immediate possession of it. This was because "there were creditors in the state of New York to whom the estate . . . was indebted in large sums of money, and, before the administratrix of the estate would be vested with the right to require delivery of the property of the estate located in . . . New York,

14

Calhoun, 53 So. 14, 15 (Fla. 1910) ("One who has merely a lien upon chattels, without any right to their possession, cannot maintain trover for their conversion.").[10]  The district court cited numerous additional Florida conversion cases holding that a plaintiff must possess, or have an immediate right to possess, the converted property at the time of conversion.  See generally Bailey, 288 F. Supp. 2d at 1271-79.  Although these cases firmly establish this proposition as a

---

it would be necessary for her to show that she had complied with the statutes of that state in such a manner as to give her such right of possession."  Meyers, 109 So. at 210.  Accordingly, her trover claim was dismissed on the ground that "[i]n trover it is not only necessary that the plaintiff have title to or right of property in the chattel which is the subject of the suit, but this must be united either with proof of possession or of a right of immediate possession."  Id. Notably, the dissent in Meyers relied on the "well settled" rule "that the title of the administrator to the property of his intestate relates back and takes effect from the time of the death of the decedent, . . . vesting in him causes of action accruing between the granting of letters and the death of the intestate."  Id. at 212 (Brown, C.J., dissenting).

[10] In Garrett v. Valley Sand & Gravel, Inc., 800 So. 2d 600 (Ala. Civ. App. 2000), the Alabama Court of Civil Appeals considered a scenario that is in some ways analogous to the case at hand.  Like their neighbors in Florida, Alabama courts hold that "[a] plaintiff cannot recover in an action of trover unless at the time of the conversion, he or she had a general or special right to the property and possession or an immediate right of possession."  Id. at 602 (quoting Kemp Motor Sales, Inc. v. Lawrenz, 505 So.2d 377, 378 (Ala.1987)) (emphasis added by Garrett).  The plaintiff in Garrett sold a piece of real property and agreed to relinquish "exclusive possession" on the closing date.  Garrett, 800 So. 2d at 602.  After the closing date, he returned to the property to retrieve some personal property he had left there.  When he discovered that his personal property was gone, he sued the buyer of the real property for conversion.  Id. at 601. The Court of Civil Appeals concluded that the plaintiff could not maintain an action for conversion of the personal property because, although he still owned it, he had no right to immediate possession of it.  The court explained that "[a]fter the closing, [he] could not have entered the realty to take possession of any personal property left there, without becoming a trespasser."  Id. at 602.  Similarly, in the instant case, although the relation-back doctrine retroactively vested title to the legal trust fund in the Government, the Government still had no right to take possession of the fund at the time Bailey allegedly converted it.  This distinction appears fatal to the Government's case, for an owner who is not entitled to possession at the time of the conversion cannot maintain an action for conversion under Florida law.

matter of black-letter Florida law,[11] none are particularly analogous to the case at hand, and for that reason they do not merit further discussion here.

C.

The question we now reach is whether the relation-back doctrine satisfies the element of possession necessary to the Government's state-law conversion and civil theft claims. In arguing that it does, the Government relies heavily on the Fourth Circuit's decision in United States v. Moffitt, Zwerling, & Kemler, P.C., 83 F.3d 660 (4th Cir. 1996). In that case, which also involved an attempt by the Government to recover legal fees paid to a law firm and subsequently ordered forfeited, the Fourth Circuit explained that "[t]o make out a conversion action in Virginia the government must have had an immediate right to possess the [money] at the time it was allegedly wrongfully converted by the law firm." Id. at 670. As in this case, the "key dispute" in Moffitt, Zwerling was whether the relation-back doctrine satisfied this element of the state-law tort. Id. The Fourth Circuit held that it did:

---

[11] See, e.g., Scherer v. Laborers' Int'l Union, 746 F. Supp. 73, 84 (N.D. Fla. 1988) ("In order to maintain an action for conversion, one must have possession of the property or an immediate right to possession."); Alex Hofrichter, P.A. v. Zuckerman & Venditti, P.A., 710 So. 2d 127, 130 (Fla. 3d DCA 1998) (observing that Ginsberg "ruled out conversion and civil theft [claims] because [the plaintiff] had no immediate right to possession of the rents"); Allen v. Universal C.I.T. Credit Corp., 133 So. 2d 442, 445 (Fla. 1st DCA 1961) ("In this state an action for conversion is regarded as a possessory action, and the plaintiff, in order to maintain this action, must have a present or immediate right of possession of the property in question.").

16

Under the relation back doctrine codified in § 853(c), the government had the right to possess the [money] at the time the law firm received it . . . . No provision of the [Comprehensive Forfeiture Act of 1984] suggests that § 853(c) cannot be relied upon to establish one element of a conversion action. [The law firm] emphasizes, however, that the government did not actually gain title to the [money] until the entry of the forfeiture order. But once the forfeiture order was entered, the government's title dated back in time to the criminal activity giving rise to the forfeiture, a date which necessarily was prior to [its receipt by the law firm]. The government therefore had a right to possess the [money at that time].

Id. (citations omitted).

While we agree with the Fourth Circuit that nothing in the Comprehensive Forfeiture Act of 1984, Pub. L. No. 98-473, 98 Stat. 2040 (1984), precludes reliance on § 853(c) to establish one element of a conversion claim—indeed, it appears that § 853(c) would establish the necessary property interest under the "modern view" of the tort, see supra Part II.B—there is also nothing in that Act to suggest that in state-law tort actions the Government should be treated as if it had a right to possess forfeited property on some earlier date when, as a matter of fact, it did not. The statute simply does not address the issue. And since Moffitt, Zwerling's discussion of this issue amounts to little more than a bare assertion that § 853(c) establishes the state-law requirement, it provides little support for the

17

Government's position.[12]

That being the case, we conclude that the better understanding of the relation-back doctrine is that it does not satisfy the state-law tort requirement that "the plaintiff . . . establish that he was in possession of the goods, or entitled to possession, <u>at the time of the conversion</u>." <u>Nat'l Ventures</u>, 847 So. 2d at 1073 (quoting Keeton et al., <u>supra</u>, § 15, at 102-03) (emphasis added). Like the plaintiff in <u>Ginsberg</u>, the Government did not actually possess, or have an immediate right to possess, the legal trust fund at the time it was converted; rather, additional judicial proceedings were then necessary to reduce its ownership interest to a right to possession. <u>Compare</u> <u>Ginsberg</u>, 645 So. 2d at 498 ("[The plaintiff] . . . only held a lien on the rents. In order to reduce that lien to possession [the plaintiff]

---

[12] The Government also cites <u>United States v. Saccocia</u>, 354 F.3d 9 (1st Cir. 2003). In that case, however, the First Circuit merely observed that the Government could seek to recover though a conversion action attorney's fees that were no longer recoverable under the federal forfeiture statutes. <u>Id.</u> at 14. Specifically, the court stated that

> since the governments right, title, and interest in all tainted property "relates back" to the date [of the relevant criminal] acts, <u>see</u> 18 U.S.C. § 1963(c) . . . , presumably it could initiate a state-law proceeding against [his attorneys] for conversion of such property, and recover compensatory damages from their non-tainted assets. However, had the government brought such a tort claim in the district court, the claim presumably would be adjudicated under substantially different standards than a claim under [the federal forfeiture statutes], since the government would bear the burden of proof, and appellants might be entitled to additional procedural safeguards under state law, such as a right to jury trial.

<u>Id.</u> (citation omitted). Thus, like our opinion in <u>McCorkle</u>, <u>Saccocia</u> does <u>not</u> "indicate[] that the relation back doctrine ipso facto satisfies the elements of conversion, nor [does it] analyze [state] law with respect to the elements of conversion." <u>Bailey</u>, 288 F. Supp. 2d at 1269 n.36 (addressing the opinions of this court and the district court in <u>McCorkle</u>).

18

was required to foreclose on the lien."), with Stowell, 133 U.S. at 16-17, 10 S. Ct. at 247 ("[W]henever a statute enacts that upon the commission of a certain act specific property used in or connected with that act shall be forfeited, the forfeiture takes effect immediately upon the commission of the act; the right to the property then vests in the United States, although their title is not perfected until judicial condemnation . . . ." (emphasis added)). The Florida Supreme Court has stated "that an action in trover is a possessory action . . . founded upon a disturbance of [the] plaintiff's right to possession," Fletcher v. Dees, 134 So. 234, 235 (Fla. 1931) (emphasis added), and as the district court accurately observed in this case, "Bailey was never in a position to harm the United States' possessory interest in the Legal Trust Fund." Bailey, 288 F. Supp. 2d at 1278. When Bailey was in control of the fund, the Government could not yet claim a right to possession of it, and by the time the Government acquired such a right to possession, Bailey was no longer in a position to disturb that right.[13]

---

[13] Although it entered judgment in favor of Bailey, the district court stated that it would have certified the question "whether the relation back doctrine could satisfy the element of possession in a Florida conversion" to the Florida Supreme Court had that option been open to it. Bailey, 288 F. Supp. 2d at 1278 n.42. While we agree with the district court that the question is one of first impression, Florida law on this issue appears quite clear. The real difficulty is in determining whether the property interest created by federal law satisfies the clear state-law rule. In other words, if we certified this question to the Florida Supreme Court, we would really be asking that court's opinion on an issue that has more to do with federal law than state law. Moreover, in light of our understanding of the federal relation-back doctrine, we would really be asking the state court whether it wanted to expand its state-law tort to reach Bailey's conduct,

19

This conclusion is entirely consistent with the Supreme Court's decisions regarding the relation-back doctrine, which have repeatedly recognized that the Government does not actually "possess" forfeitable assets until an order of forfeiture is entered and that "judicial condemnation" is required to "perfect" the Government's title to such assets. See supra Part II.A. As such, the result does not, as the Government argues, violate the "statutory language or legislative purpose of the statute" or run afoul of the Supremacy Clause. In this case, the rights vested in the Federal Government as a matter of federal law simply do not match the requirements of the state-law torts on which the Government brought suit. Thus, we do not suggest that it would be beyond Congress's power to mandate that state law treat the Federal Government as if it actually had a right to possess forfeited property as of the time of the act giving rise to forfeiture; instead, we conclude only that, read in light of longstanding Supreme Court precedent on the relation-back doctrine, § 853(c) does not create such an unusual, backdated right of possession.

---

rather than whether state law, as currently stated, renders Bailey liable.

We also note that the district court identified three distinct reasons why the Government could not establish an immediate right to possession. See id. at 1269-79. While we generally agree with the district court's reasoning and have benefitted from its thorough exploration of this issue, it is sufficient for us to say that the Government did not have an immediate right to possession of the legal trust fund at the time of the alleged conversion and, therefore, cannot maintain an action against Bailey for either conversion or civil theft.

20

**III.**

As a postscript, we want to dispel any impression that the Government is powerless to prevent a defense attorney or any other third party from dissipating assets that will be subject to forfeiture upon conviction. Under 21 U.S.C. § 853(e)(1), "[u]pon application of the United States, the court may enter a restraining order or injunction, require the execution of a satisfactory performance bond, or take any other action to preserve the availability of property" subject to forfeiture under the statute. Here, the Government could have sought such an order when it indicted the McCorkles simply by alleging that the legal trust fund was subject to forfeiture upon conviction. Id. § 853(e)(1)(A). Indeed, it could have obtained the order even before securing an indictment. Id. § 853(e)(1)(B) (requiring the Government to demonstrate (i) "a substantial probability that [it] will prevail on the issue of forfeiture and that failure to enter the order will result in the property being . . . unavailable for forfeiture" and (ii) that "the need to preserve the availability of the property . . . outweighs the hardship on any party against whom the order is to be entered"); see also id. § 853(e)(2) (authorizing issuance of an ex parte, pre-indictment temporary restraining order if "there is probable cause to believe that the property . . . would, in the event of conviction, be subject to forfeiture . . . and that provision of notice will jeopardize the

21

availability of the property for forfeiture"). Finally, the Government could have sought a warrant authorizing an actual seizure of the trust fund. Id. § 853(f) ("If the court determines that there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture and that an order under subsection (e) of this section may not be sufficient to assure the availability of the property for forfeiture, the court shall issue a warrant authorizing the seizure of such property."). Had the Government taken any of these steps, this state-law conversion action most likely would have been unnecessary.[14]

## IV.

For the foregoing reasons, the judgment of the district court is

**AFFIRMED.**

---

[14] In May 1997, the Grand Court of the Cayman Islands granted the Government's motion for an order restraining the McCorkles from disposing of $7 million deposited at the Royal Bank of Canada in the Cayman Islands, including the $2 million legal trust fund. The Grand Court entered the order pursuant to the Treaty Concerning the Cayman Islands Relating to Mutual Legal Assistance in Criminal Matters, July 3, 1986, U.S.-U.K., 26 I.L.M. 536. In January 1998, however, the Grand Court vacated the order after concluding, inter alia, that the United States had failed to institute forfeiture proceedings against the McCorkles in the United States within seven days of its application for a Cayman restraining order, as required by the Cayman law implementing the Treaty. The Grand Court stayed execution of its ruling pending appeal. In July 1998, the Court of Appeal of the Cayman Islands affirmed the judgment of the Grand Court. By this time, only the legal trust fund remained in the Cayman Islands. Of the original $7 million, $2 million had been paid to the IRS for unpaid taxes and $3 million had been repatriated to secure the McCorkles' release on bond pending trial. The Government did not file any further appeal or seek a new restraining order.