[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 18, 2009
THOMAS K. KAHN
CLERK

_____

No. 07-13010

_____

D. C. Docket No. 07-80021-CR-KAM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

KERRI L. KALEY,
BRIAN P. KALEY,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 18, 2009)

Before TJOFLAT, MARCUS  and WILSON, Circuit Judges.

MARCUS, Circuit Judge:

In this case, a grand jury sitting in the United States District Court for the Southern District of Florida returned an indictment charging the defendants, Brian Kaley and Kerri Kaley, with conspiracy to transport stolen property, transportation of stolen property, obstruction of justice, and money laundering. The indictment also included a criminal forfeiture count. After the return of the indictment, the government, ex parte, obtained a protective order enjoining the Kaleys from encumbering the property listed in the forfeiture count. The Kaleys moved the district court to vacate the order so they could use the restrained assets to retain counsel of their choice, and they requested that the district court hold an evidentiary hearing to determine whether there was probable cause to believe that the property was forfeitable. The district court declined to hold a hearing and denied the motion to vacate the protective order. The Kaleys now appeal these rulings. After thorough review, we reverse and remand for further proceedings consistent with this opinion.

I.

In January 2005, Kerri Kaley, then a sales representative with Ethicon Endo-Surgery, was informed she was the target of a grand jury investigation in the Southern District of Florida. Kaley was suspected of stealing prescription medical devices ("PMDs") from hospitals and then selling them on the black market.

2

Kaley retained Howard Srebnick of Black, Srebnick, Kornspan & Stumpf, P.A. as her counsel in the investigation. Kaley's husband, Brian Kaley, who was also under investigation was initially represented by Howard Srebnick and later retained a separate attorney, Susan Van Dusen, to avoid a potential conflict of interest. Together, the two attorneys informed the Kaleys that their legal fees to take the case through trial would be approximately $500,000. To obtain funds to pay those fees, the Kaleys applied for and obtained a home equity line of credit of $500,000 on their residence and used the proceeds to buy a certificate of deposit ("CD").

On February 6, 2007, the grand jury returned a seven-count indictment against the Kaleys.[1] Count One charged a conspiracy to transport PMDs in interstate commerce while knowing them to have been stolen, in violation of 18 U.S.C. § 371. Counts Two through Six charged five substantive § 2314 offenses,[2] and Count Seven charged obstruction of justice, in violation of 18 U.S.C. § 1512(b)(3). The indictment also sought criminal forfeiture of all property traceable to the § 2314 offenses, including the CD, and a money judgment in the amount of

---

[1] The indictment was also returned against Jennifer Gruenstrass, whose case has since been severed from the Kaleys'.

[2] Section 2314 provides that "[w]hoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud" shall be subject to criminal liability. 18 U.S.C. § 2314.

$2,195,635.28.[3]

On February 7, 2007, the Government moved the district court <u>ex parte</u> for a protective order restraining the Kaleys from transferring or otherwise disposing of the property listed in the forfeiture count, and a magistrate judge, concluding that the indictment established probable cause that the property was "traceable to" the Kaleys' commission of the § 2314 offenses, granted the motion the same day.[4] The next day, the Government filed a notice of <u>lis pendens</u> against the Kaleys' residence.

On March 5, 2007, the Kaleys moved the district court to vacate the February 7th protective order. They contended that the order prevented them from retaining counsel of their choice in violation of their Sixth Amendment right to the

---

[3] The forfeiture was authorized by the civil forfeiture statute, 18 U.S.C. § 981(a)(1)(C), which provides for forfeiture of property actually "traceable to" the specific crime alleged -- here, conspiracy to violate and violations of § 2314. Such forfeiture can become part of a criminal sentence pursuant to 28 U.S.C. § 2461(c), which provides in pertinent part that "[i]f the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case." The "traceable to" language limited the United States to forfeiture of $140,000 of the Kaleys' assets.

[4] The Government based its motion on § 413 of the Controlled Substances Act, 21 U.S.C. § 853, which provides that "[u]pon application of the United States, the court may enter a restraining order or injunction, require the execution of a satisfactory performance bond, or take any other action to preserve the property [listed in the forfeiture count]." That section of the Controlled Substances Act applies to the Kaleys pursuant to 28 U.S.C. § 2461(c). <u>See</u> <u>supra</u> note 3.

representation of counsel. A magistrate judge heard this motion too on April 6th[5]

and sustained the protective order; however, he limited the protective order's scope

(insofar as it applied to the CD) to $140,000.[6]

On April 10, 2007, the grand jury returned a superseding indictment. This

indictment replicated the first seven counts of the first indictment and added an

additional count -- a charge that the Kaleys had conspired to launder the proceeds

of the § 2314 offenses, in violation of 18 U.S.C. § 1956(h).[7] This indictment also

sought the criminal forfeiture of the CD and the Kaleys' residence on the theory

that those assets were "involved in" the Kaleys' commission of the § 1956(h)

offense.[8] On April 17th, the Kaleys renewed their motion to vacate the February

7th protective order (as amended by the order of April 6th), and expressly

---

[5] The motion was referred to a second magistrate judge, who handled the case in place of the initial magistrate judge. This magistrate judge heard the Kaleys' motion during a telephone conference call, which was not recorded or transcribed.

[6] At the same time, the magistrate judge scheduled a hearing for April 16, 2007 on the Kaleys' motion to vacate the protective order in its entirety.

[7] Section 1956(h) provides that "any person who conspires to commit any offense defined in this section or § 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

[8] By adding the money laundering conspiracy to the indictment, the grand jury enabled the United States to utilize the criminal forfeiture statute, 18 U.S.C. § 982(a)(1), which authorizes forfeiture of assets "involved in"-- rather than "traceable to the proceeds of"-- the offense.

requested a pretrial, post-restraint evidentiary hearing.[9]

The magistrate judge heard the motion on April 27th. He questioned whether the indictment alone provided probable cause to restrain the defendants' assets and ordered the prosecutor to submit an affidavit supporting probable cause. The prosecutor responded by filing, in secret and under seal, an affidavit executed by the FBI case agent.

On May 1, 2007, the magistrate judge issued two orders. In the first order, he found probable cause -- based on the indictment and the case agent's affidavit -- that the CD and the Kaleys' residence were "involved in" the violations of § 1956(h) and § 2314. In the second order, he amended the February 7th protective

_____

[9] In addition to moving the district court to vacate the protective order, the Kaleys moved the district court to strike from the indictment the allegation seeking forfeiture under 18 U.S.C. § 982(a)(1) on the ground that the allegation was "vindictive," in retaliation for the Kaleys having moved the court on March 5th to vacate the February 7th protective order. The Kaleys also moved the district court to strike from the indictment the allegation seeking forfeiture under 18 U.S.C. § 981(a)(1)(C) on the ground that § 981(a)(1)(C) could not be applied without violating the Ex Post Facto Clause. The district court denied both motions.

In their blue brief, the Kaleys ask us to review these two rulings as well, which are not independently appealable, under the doctrine of pendent appellate jurisdiction. "Under the pendent appellate jurisdiction doctrine, we may address [such] orders [only] if they are 'inextricably intertwined' with an appealable decision or if 'review of the former decision [is] necessary to ensure meaningful review of the latter.'" Hudson v. Hall, 231 F.3d 1289, 1294 (11th Cir. 2000) (quoting Summit Med. Assoc., P.C. v. Pryor, 180 F.3d 1326, 1335 (11th Cir. 1999)) (quotation marks omitted). However, the two rulings are not inextricably intertwined with the district court's ruling denying the Kaleys' motion for a pretrial hearing on the validity of the February 7th protective order; nor is review of those rulings necessary to ensure meaningful review of the district court's June 25, 2007 order denying the pretrial, post-restraint hearing the Kaleys are seeking. We, therefore, decline to exercise our pendent appellate jurisdiction.

order to include within its scope the full value of the CD and the Kaleys' residence. On May 2nd, the magistrate judge issued a third order denying the Kaleys' motion to vacate the protective order and to hold a pretrial, post-restraint evidentiary hearing. In that order, the magistrate judge concluded that "no post-restraint hearing was necessary until trial."

On May 7, 2007, the Kaleys appealed the magistrate judge's May 1st and 2nd orders to the district court. On June 25th, the district court affirmed the magistrate judge's issuance of the protective order, concluding that the case agent's affidavit "demonstrated probable cause to believe that the Defendants' residence was 'involved in' the money laundering offense charged in the superseding indictment, and that all but $63,007.65 of the funds used to obtain the CD were 'traceable to' the residence." The trial court also affirmed the magistrate judge's denial of a pretrial evidentiary hearing, concluding that postponing the hearing until the trial itself satisfied due process. On June 27, 2007, the Kaleys lodged this interlocutory appeal, challenging the district court's decision.

## II.

This Court has jurisdiction to entertain appeals of "[i]nterlocutory orders of the district courts . . . granting, continuing, modifying, refusing, or dissolving injunctions." 28 U.S.C. § 1292(a)(1). Protective orders designed to preserve

forfeitable assets, like the one in this case, qualify as injunctions for the jurisdictional purposes of § 1292(a)(1). United States v. Monsanto, 491 U.S. 600, 602-06 (1989) (exercising interlocutory jurisdiction to review a pretrial restraining order, which was granted ex parte for the purpose of preserving forfeitable assets prior to forfeiture); Roberts v. United States, 141 F.3d 1468, 1471 (11th Cir. 1998) (stating that denial of a motion to vacate a protective order over forfeitable assets would be reviewable as an interlocutory order in the appellate courts under § 1292(a)(1)). Such protective orders are like injunctions because they are "directed to a party, enforceable by contempt, and designed to accord or protect some or all of the substantive relief sought by the complaint in more than temporary fashion." 16 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3922, at 65 (2d. ed. 1996) (quotation marks omitted). We, therefore, review under § 1292(a)(1) the district court's order denying the Kaleys' motion to vacate the protective order and denying them a pretrial evidentiary hearing.

### III.

With our jurisdiction settled, we address the main issue raised today: the Kaleys' argument that they have a due process right to a post-indictment, pretrial evidentiary hearing on the legality of the restraints on their property especially

8

needed for the purpose of retaining counsel of their choice. In doing so, we are controlled by our decision in United States v. Bissell, 866 F.2d 1343 (11th Cir. 1989). Bissell presented the same argument and this Court clearly held that a defendant whose assets are restrained pursuant to a criminal forfeiture charge in an indictment, rendering him unable to afford counsel of choice, is entitled to a pretrial hearing only if the balancing test enunciated in Barker v. Wingo, 407 U.S. 514 (1972), is satisfied. Id. at 1353. Thus, our task in this appeal is to decide whether the district court correctly interpreted and applied the Barker balancing test. After thorough review, we conclude that the district court incorrectly applied that test, and we, therefore, reverse and remand the case for further consideration consistent with this opinion.

In Bissell, a grand jury indicted each of the defendants with one or more of the following offenses: violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.; engaging in a Continuing Criminal Enterprise, 21 U.S.C. § 848; and conspiring to import cocaine, 21 U.S.C. § 846. Bissell, 866 F.2d at 1347. The indictment contained criminal forfeiture counts pursuant to 21 U.S.C. § 853, in which the grand jury alleged that all assets derived from, or devoted to, violations of federal narcotics laws were subject to forfeiture upon the defendants' convictions. Id. Following the return of the

9

indictment, the Government seized the defendants' assets pursuant to a warrant it obtained from the district court ex parte pursuant to 21 U.S.C. § 853(f). Id. No pretrial, post-indictment motion was made to the district court contesting the legality of the court-ordered restraints and no hearing was sought. Id. at 1347–48, 1353.

On appeal, the Bissell defendants argued, among other things, that they were entitled under the Fifth Amendment's Due Process Clause to a pretrial hearing at which the government must demonstrate that the forfeiture was justified and that the failure to provide that hearing fatally tainted their convictions. Id. at 1352. A panel of this Court directly addressed and unambiguously rejected this claim, applying the Barker v. Wingo framework and holding[10] under the circumstances of

---

[10] Bissell's determination that the Barker factors should be used to evaluate when a defendant is entitled to a post-indictment, pretrial hearing under due process of law is holding, not dicta. As our cases frequently have observed, dicta is defined as those portions of an opinion that are not "not necessary to deciding the case then before us." United States v. Eggersdorf, 126 F.3d 1318, 1322 n.4 (11th Cir. 1997); Schwab v. Crosby, 451 F.3d 1308, 1327 (11th Cir. 2006); Jordan v. Hamlett, 312 F.2d 121, 124 (5th Cir. 1963); Carpenter Paper Co. v. Calcasieu Paper Co., 164 F.2d 653, 655 (5th Cir. 1947); see also United States v. Crawley, 837 F.2d 291, 292 (7th Cir. 1988) ("We have defined dictum as a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding.") (quotation marks omitted). Conversely, the holding of a case is, as the Supreme Court observed, comprised both of the result of the case and "those portions of the opinion necessary to that result by which we are bound." Seminole Tribe of Florida v. Florida, 517 U.S. 44, 66-67 (1996). Bissell's conclusion that there was no violation of the defendants' Fifth Amendment due process rights was necessary to its ultimate decision. In fact, Bissell's adoption and use of the Barker test forms a critical part of the case's holding. Our conclusion that the defendants' due process rights were not violated was driven by, and cannot be understood apart from our application of the Barker test to the facts of the case. While it is true that the court could have decided the case on other grounds, such as plain error, the panel resolved the defendant's due process claim by

10

the case that the defendants were not entitled to a post-indictment, pretrial hearing.

Indeed, we framed the specific issue before us this way:

> [Appellants] contend that this scheme violate[d] due process. They argue that when pretrial restraints are imposed on assets, the Fifth Amendment requires a hearing on the merits at which the government must prove the probability that the defendant will be convicted and that his assets will be forfeited. Since no such hearing occurred in this case, appellants urge that they have been denied due process of law. We disagree.

Id. at 1352; see also id. ("We must consider whether appellants had a right to an

---

explicating and applying the Barker v. Wingo analysis.

Despite the suggestion in the special concurring opinion, it is of no moment that it was the Bissell panel, and not the parties, that proposed the Barker analysis as the legal rule of decision. Plainly, this Court employed the Barker factors to determine whether a pretrial hearing was required. There is no requirement in our law that the explication of the governing principle of law may only be taken from an argument advanced by a party. What matters in discerning whether a rule of law expounded by a court is in fact holding is whether it was necessary to the result reached, or, in the alternative, could be discarded without impairing the foundations of the holding. And here, a panel of this Court deliberately and carefully offered the analytical framework set forth in Barker as the way to analyze and ultimately decide the issue.

We add that another prior panel of our Court has also observed that Bissell's application of the Barker factors is holding. United States v. Register questioned the soundness of Bissell, observing that "in the appropriate case" Bissell "perhaps should" be re-examined in light of the fact that we are "the only circuit holding that, although pre-trial restraint of assets needed to retain counsel implicates the Due Process Clause, the trial itself satisfies this requirement." 182 F.3d 820, 835 (11th Cir. 1999) (emphasis added). And our Court is not the only one to have thought that the application of the Barker factors by the Bissell court constituted holding. See, e.g., United States v. Monsanto, 924 F.2d 1186, 1191 (2d Cir. 1991); United States v. Holy Land Found. for Relief & Dev., 493 F.3d 469, 475 (5th Cir. 2007); United States v. Kirschenbaum, 156 F.3d 784, 793 (7th Cir. 1998); United States v. Farmer, 274 F.3d 800, 803 (4th Cir. 2001); 13 Fed. Proc. § 35:790 ("At the other end of the spectrum, the Eleventh Circuit has held that there is no due process right to a hearing prior to the entry of an order freezing a defendant's property, and the due process clause imposes no bright line dictating when a post-restraint hearing might occur in a criminal forfeiture case.").

11

immediate post-restraint hearing.").

The Bissel panel recognized that "once an indictment has issued, the court may order such restraints [to preserve forfeitable assets in a criminal case] ex parte." Id. at 1349. In addition, the Court explained that by its own terms 21 U.S.C. § 853(a)(1) does not require a hearing before or after the restraint of assets, and that "the statute's legislative history reveals that while Congress did not intend there to be a hearing prior to the issuance of a restraint, the district court does retain authority to hold a post-restraint hearing." Id. (citing S. Rep. No. 225, 98th Cong., 1st Sess. 191, 203, reprinted in 1984 U.S.C.C.A.N. 3182, 3386). Further, the panel observed:

> At that hearing, the defendant may undertake to prove that the government wrongfully restrained specific assets which are outside the scope of the indictment, not derived from, or used in, criminal activity, but may not challenge the validity of the indictment itself and thus require that the government present its evidence before trial.

Id.

In deciding which analytical framework to apply to determine what process, if any, is due to a criminal defendant whose assets have been restrained pursuant to a criminal forfeiture charge thereby preventing him from retaining his counsel of choice, the Bissell panel looked to United States v. $8,850 in U.S. Currency, 461 U.S. 555 (1983), for guidance. In that case, the Supreme Court addressed the

12

narrow question of whether an eighteen-month delay between the seizure of currency that was being transported without being reported to the U.S. Customs Service, in violation of 31 U.S.C. § 1101, and the resulting civil forfeiture proceedings, violated the due process rights of an individual with an interest in the seized currency. Id. at 556-62. In $8,850, the Court imported the four-factor balancing test laid out in Barker v. Wingo, 407 U.S. 514 (1972), a case that assessed whether a delay in trying a criminal case violated a defendant's Sixth Amendment right to a speedy trial as the applicable analytical framework. The stated reason for importing the Barker test into the realm of the defendant's claim under the due process clause in $8,850 was that "the Fifth Amendment claim here – which challenges only the length of time between the seizure and the initiation of the forfeiture trial – mirrors the concern of undue delay encompassed in the right to a speedy trial." Bissell, 866 F.2d at 1352 (quoting $8,850, 461 U.S. at 564). Bissell, in turn, imported the Barker test into the realm of a defendant's due process claim when his assets were restrained without a hearing pursuant to § 853, thereby preventing him from retaining counsel of choice.

Thus, in Bissell, we evaluated the defendants' claim in light of the four factors taken from Barker: (1) the length of the delay before the defendants received their post-restraint hearing; (2) the reason for the delay; (3) the

13

defendants' assertion of the right to such a hearing pretrial; and (4) the prejudice the defendants suffered due to the delay weighed against the strength of the United States's interest in the subject property. 866 F.2d at 1352.

As for the first of the Barker factors, in Bissell, we concluded that no post-restraint hearing was necessary because the delay of eight months between the restraint of the assets and the criminal trial was insignificant. 866 F.2d at 1353. As for the reason for delaying the hearing until trial (the second of the Barker factors), we referenced the statute's legislative history and explained that requiring the government to meet the requirements for issuing a temporary restraining order and to establish the merits of the underlying criminal case and the forfeiture before the trial would make obtaining a restraining order difficult because of the abundant dangers surrounding the premature disclosure of the government's case and its witnesses. Id.

As for the third factor, we held that whether the defendants' asserted their right to a post-indictment hearing prior to trial, weighed against the defendants in Bissell because the defendants "d[id] not point to, and the record d[id] not disclose, any motion for a hearing to contest the government's restraints." Id. at 1353.

Finally, as for the last of the Barker factors (the prejudice associated with the restraint), we recognized the not inconsiderable danger that "perfectly legitimate

assets will be wrongfully restrained," which would, in turn, result in palpable prejudice to the defendant, particularly when the defendant sought to use those assets to retain counsel of his choice. 866 F.2d at 1354. But, we observed, when both parties arguably have property rights in the constrained assets, "a due process analysis must comprehend both interests." Id. Finally, weighing the four Barker factors in concert, we concluded that the defendant suffered no due process violation. Id.

The Kaleys argue, however, that Bissell is no longer good law in light of the United States Supreme Court's recent decision in United States v. Gonzalez-Lopez, 548 U.S. 140 (2006). They are mistaken. We may disregard the holding of a prior opinion only where that "holding is overruled by the Court sitting en banc or by the Supreme Court." Smith v. GTE Corp., 236 F.3d 1292, 1300 n.8 (11th Cir. 2001). To constitute an "overruling" for the purposes of this prior panel precedent rule, the Supreme Court decision "must be clearly on point." Garrett v. Univ. of Ala. at Birmingham Bd. of Trs., 344 F.3d 1288, 1292 (11th Cir. 2003); see also Main Drug, Inc. v. AETNA U.S. Healthcare, Inc., 475 F.3d 1228, 1230 (11th Cir. 2007) ("Of course, we will not follow prior panel precedent that has been overruled by a Supreme Court decision, but without a clearly contrary opinion of the Supreme Court or of this court sitting en banc, we cannot overrule a decision of a prior panel

15

of this court.") (quotation marks and citations omitted); United States v. Chubbuck, 252 F.3d 1300, 1305 n.7 (11th Cir. 2001) ("[T]he prior precedent rule would not apply if intervening on-point case law from either this Court en banc, the United States Supreme Court, or the Florida Supreme Court existed."). In addition to being squarely on point, the doctrine of adherence to prior precedent also mandates that the intervening Supreme Court case actually abrogate or directly conflict with, as opposed to merely weaken, the holding of the prior panel. See In re Provenzano, 215 F.3d 1233, 1235 (11th Cir. 2000) ("We would, of course, not only be authorized but also required to depart from [our prior decision] if an intervening Supreme Court decision actually overruled or conflicted with it."); Chambers v. Thompson, 150 F.3d 1324, 1326 (11th Cir. 1998) ("We are bound to follow a prior panel or en banc holding, except where that holding has been overruled or undermined to the point of abrogation by a subsequent en banc or Supreme Court decision.").

In Gonzalez-Lopez, the Supreme Court addressed whether a district court erroneously refused the defendant's chosen counsel the right to practice pro hac vice before that court. 548 U.S. at 147-51. The government conceded that the denial deprived the defendant of counsel of choice, and the Supreme Court reversed, finding the disqualification to be erroneous and not subject to harmless

16

error review.  Id.  The case in no way addressed what, if any, right a criminal defendant has to use assets subject to criminal forfeiture pursuant to an indictment in order to pay for the legal fees of the counsel of his choice.  Nor did the case in any way address the circumstances under which a defendant making a Sixth Amendment counsel of choice challenge to a post-indictment pretrial restraint would be entitled to a hearing.  Thus, it cannot be said that Gonzalez-Lopez is "clearly on point," or that it "directly conflicts with" the analytical framework announced by this Court in Bissell.  In fact, the Supreme Court itself said in Gonzalez-Lopez that "[n]othing we have said today casts any doubt or places any qualification upon our previous holdings that limit the right to counsel of choice and recognize the authority of trial courts to establish criteria for admitting lawyers to argue before them," id. at 151, including cases such as Bissell.  Accordingly, the district court was bound to apply Bissell in exercising its discretion to award the Kaleys a hearing.

In the case at hand, the district court did employ the Bissell factors to determine whether the Kaleys had a due process right to a pretrial evidentiary hearing on the legality of the restraints.  It addressed each of the four factors and found that the first and second factors weighed in favor of the Government. Among other things, the district court found that the length of delay in this case (a

17

projected eight months) was not significant and that the government had a substantial interest in not revealing its case and witnesses before trial. Neither of these two determinations amounts to an abuse of discretion, although it is worth noting in passing that in this white collar case the defendants have already had access to much of the government's evidence as the case against their co-conspirator, Jennifer Gruenstrass, was severed and she was tried and acquitted in November, 2007. See Bissell, 866 F.2d at 1349 (explaining that the legislative history of 21 U.S.C. § 853(a)(1) "reveals that while Congress did not intend there to be a hearing prior to the issuance of a restraint, the district court does retain authority to hold a post-restraint hearing.").

As for the third factor -- the defendants' pretrial assertion of their right -- the district court held that

> [w]hile Defendants have [asserted their right to a hearing] in this case, that fact does not end the inquiry. As the Bissell court noted, the purpose of a post-restraint hearing is to determine whether legitimate assets – those outside the scope of the indictment – have been wrongfully restrained. In the present case, based upon the money laundering charge and this Court's probable cause determination, the only way Defendants could demonstrate that the restrained assets, other than the $63,007.65 that is being released by this order, are outside the scope of the indictment is to challenge its validity on the merits. As has been seen previously, such a challenge cannot be made pretrial. At best, the third factor is in equipoise.

United States v. Kaley, No. 07-80021-CR, 2007 WL 1831151, at *3 (S.D. Fla.

18

June 25, 2007) (citations and quotations omitted) (emphasis added and omitted). As for the fourth factor, the district court did not clearly state whether it cut in favor of or against a pretrial evidentiary hearing, observing only that "a district court's probable cause determination, as is present here, diminishes the prejudicial effect of the pretrial restraint," but offering no indication of the nature, degree, or impact of any such diminution. Id. at *4.

The district court plainly made an error of law in disposing of Bissell's third factor. As the underscored language of the district court's holding reveals, in evaluating the third factor, the district court concluded that, under Bissell, once probable cause has been determined, the only way that a defendant can show that assets are not forfeitable is to establish that the crime charged in the indictment did not occur. This, however, was not the holding of Bissell and could not have been the opinion's intent, because, as the district court correctly noted, a challenge to the indictment cannot be made pretrial. A pretrial challenge to the indictment would require the district court to hold an evidentiary hearing to determine whether the crime occurred. The court would hear the Government's case and the defendant's response, and then determine whether the crime had occurred and, thus, whether the assets were forfeitable. In many cases, such a hearing would go so far as to render the trial on the merits of the criminal charge unnecessary. In short, such a

19

procedure would require the Government to preview its case -- at the very least, the Government would have to put on enough evidence to withstand a motion to dismiss the charge. But the Bissell court undeniably contemplated some circumstances in which, despite the presence of probable cause, a pretrial hearing would be required.

The principle of law Bissell advances is that, after weighing the four Barker factors, the district court may grant the defendant's request for a pretrial evidentiary hearing in order to determine whether assets described in the forfeiture count of the indictment were wrongly seized (or placed under the restraint of a protective order). The court in an appropriate case may grant the defendant's request notwithstanding the fact that the return of the indictment established probable cause to seize or restrain the assets, possibly, as in the Kaleys' case, with that probable cause buttressed by an affidavit submitted by the case agent ex parte and in camera. The purpose of the hearing would not be to determine guilt or innocence but, rather, to determine the propriety of the seizure. Moreover, in such a hearing, the defendant, as the movant, would have the burden of proof, and the prosecution would thus be saved from having to preview its entire case.

This is the same approach that the Supreme Court has taken in civil cases where property is seized based on an ex parte proceeding. See, e.g., Mitchell v.

20

W.T. Grant Co., 416 U.S. 600 (1974).  In these cases, a creditor claims an interest in a debtor's property and files suit against the debtor to obtain such interest.  Id. at 601–02. To ensure that the property is not disposed of prior to the trial on the merits, the creditor obtains a court order freezing the debtor's property by making an ex parte showing of probable cause that the creditor is likely to prevail on the merits.  Id. at 602–03.  The Supreme Court has held that, in these situations, the debtor is, at least, owed a post-restraint hearing to determine whether probable cause actually exists.  See id. at 607; Fuentes v. Shevin, 407 U.S. 67 (1972).  The post-restraint hearing the Court has ordained, however, is not the trial on the merits of the plaintiff's claim.  Mitchell, 416 U.S. at 603 (identifying the pretrial hearing as separate from the trial on the merits).  Rather, the purpose of the hearing is to reduce the possibility that the court imposed the restraint improvidently.  Fuentes, 407 U.S. at 81, 92 S. Ct. at 1994 (noting that the purpose of a pretrial hearing is to prevent "substantively unfair and simply mistaken deprivations of property interests").

It is clear, then, that notwithstanding the district court's probable cause determination, the Kaleys were entitled to challenge the restraints on their assets; in doing so, they would not be requiring the Government to establish the charged offense.  Because the Kaleys challenged the restraints early and often, this case is

21

very different than Bissell, where "nothing in the record indicate[d] that [the defendants] desired an early hearing to contest the government's restraints." Bissell, 866 F.2d at 1353. At a minimum then, Bissell's third factor, the "assertion of the right" to a pretrial hearing, should weigh in the defendants' favor when the defendants have taken every available step to contest the restraints.

In addition, the district court also should engage in a more searching exposition and calculus of the fourth Bissell factor, which requires it to weigh the prejudice suffered by the defendants due to the delay before their post-restraint probable cause hearing against the strength of the United States' interest in the subject property, and take care to give the powerful forms of prejudice that the Kaleys will suffer ample consideration. 866 F.2d at 1354. As Bissell pointed out, a wrongful deprivation of a defendant's legitimate assets rendering him unable to retain his counsel of choice will severely impair his ability to defend himself. Id. at 1354. Indeed, our law is clear and unambiguous that depriving a defendant of the counsel of his choice is a serious and significant impediment to his ability to effectively navigate our nation's criminal procedures and protections. See Gonzalez-Lopez, 548 U.S. at 146 ("[T]he Sixth Amendment right to counsel of choice . . . commands, not that a trial be fair, but that a particular guarantee of fairness be provided -- to wit, that the accused be defended by the counsel he

22

believes to be best."); <u>Wheat v. United States</u>, 486 U.S. 153, 159 (1988) (explaining that, although it is subject to limitations to ensure representation by effective counsel, "the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment"); <u>see generally</u> <u>United States v. Garey</u>, 540 F.3d 1253, 1263 (11th Cir. 2008) (<u>en banc</u>) ("The right to counsel is a fundamental part of the adversary system of criminal justice and recognizes the obvious truth that the average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty.") (quotation marks and citation omitted).

Being effectively shut out by the state from retaining the counsel of one's choice in a serious criminal case is a substantial source of prejudice, but the inequities in this case actually go beyond being able to retain the counsel of choice. The restraint of assets in the present case prohibits the Kaleys not only from retaining their counsel of choice, but also from retaining the experienced attorneys who have represented them since the grand jury investigation began in January, 2005. Losing access to long-time counsel who have already invested substantial time into learning the intricacies of the Kaleys' case and preparing for trial will unquestionably cause the Kaleys prejudice.

Moreover, in order to retain any private counsel (not even the counsel of

choice), the Kaleys must incur a $183,500 non-recoverable liquidation and tax penalty in order to release their only remaining unrestrained assets (retirement and college savings accounts).  On this record, it is clear that in order to access the $323,000 contained in their 401(k) plan at the time the district court considered their motion, the Kaleys would be forced to pay $168,000 in early withdrawal penalties and income taxes leaving them with only $155,000 to allocate for their legal fees.  To access the $111,000 contained in college savings accounts, the Kaleys must pay $15,000 in liquidation penalties and capital gains taxes.  And, even if they ultimately prevail in this case, the Kaleys will never be able to recover those penalties and taxes.

These serious and substantial burdens must be weighed by the district court against the government's real interest in recovering the seized assets if, indeed, the Kaleys are guilty of the charged criminal conduct and those assets are found to be traceable to the illicit activity.  This interest is supported in some measure by the grand jury's probable cause determinations in returning two indictments seeking the criminal forfeiture of the CD and the Kaleys' residence, as well as by the probable cause affidavit executed by the FBI case agent and filed by the Government.  See Bissell, 866 F.2d at 1354 ("[T]he district court's probable cause determinations provided a significant check on the government's power to restrain

24

legitimate, nonindicted assets."). We leave it to the district court to weigh the powerful competing interests in order to calculate whether the probable cause determination and the accompanying government affidavit diminish the undeniable and substantial prejudice the Kaleys will suffer if they are forced to liquidate their remaining unrestrained assets and retain new counsel at this stage in the proceedings. Under Bissell, therefore, the trial court must re-weigh the Barker factors in order to calculate whether the Kaleys are entitled to a post-indictment pretrial evidentiary hearing.

IV.

If we were writing on a blank slate today we would be inclined, as Judge Tjoflat suggests in his special concurrence, to apply the test announced by the Supreme Court in Mathews v. Eldridge, 424 U.S. 319, 335 (1976), in order to determine what process is due to defendants in circumstances like these.

Indeed, virtually every circuit to address this issue other than this Court has found that criminal defendants such as these are entitled, under the Due Process Clause of the Fifth Amendment, to a pretrial hearing in order to determine whether it is likely that the restrained assets will be subject to forfeiture.[11] See Holy Land

_____

[11] Because 21 U.S.C. § 853(1)(a), the statute governing the procedures applicable to a criminal forfeiture charge, does not expressly provide for a pretrial hearing regarding a post-indictment restraint of assets subject to criminal forfeiture, such a hearing is required only because it may be mandated by the Fifth Amendment's right to due process.

25

Found. for Relief & Dev., 493 F.3d at 475; United States v. Jones, 160 F.3d 641, 647 (10th Cir. 1998); Monsanto, 924 F.2d at 1195-98; United States v. Moya-Gomez, 860 F.2d 706, 728-29 (7th Cir. 1988); United States v. Harvey, 814 F.2d 905, 929 (4th Cir. 1987), superseded as to other issues, In re Forfeiture Hearing as to Caplin & Drysdale, Chartered, 837 F.2d 637 (4th Cir. 1988) (en banc), aff'd, 491 U.S. 607 (1989); United States v. Crozier, 777 F.2d 1376, 1384 (9th Cir. 1985); United States v. Lewis, 759 F.2d 1316, 1324-25 (8th Cir. 1985); cf. United States v. Long, 654 F.2d 911, 915 (3d Cir. 1981). In fact, the more recent cases have utilized the balancing test employed in Mathews.

The Mathews test may be particularly well suited to the present case, because it is the traditional test employed in order to determine what process is due before a deprivation of property at the hands of the state may be sustained. See Mathews, 424 U.S. at 333 (deciding whether an individual is entitled to a hearing under the Fifth Amendment to contest the government's deprivation of a property interest); Grayson v. King, 460 F.3d 1328, 1340 (11th Cir. 2006) ("Mathews applies only where an individual has a liberty or property interest that the government seeks to eliminate."); see also Moya-Gomez, 860 F.2d at 725-26 (determining that the defendant suffered "a deprivation of property in the constitutional sense," because "[t]he restraining order . . . operates to remove the

26

assets from the control of the defendant on the claim of the government that it has a higher right to those assets. While the restraining order does not divest definitively the ownership rights of the defendant, it certainly does remove those assets from his immediate control and therefore divest him of a significant property interest"). There can be little doubt that the posture of this case plainly deprives the defendants of their assets and that the question the Kaleys have raised is one of procedural due process.

If we were to apply Mathews in this case, the Kaleys would be entitled to a pretrial hearing on the merits of the protective order. At the end of the day, however, we are duty bound to apply our case precedent and examine this matter under the framework outlined by this Court in Bissell.

V.

In sum, the district court did not abuse its discretion in assessing the first two Bissell factors. But, the district court plainly made an error of law in interpreting and applying the third of the Bissell factors. On the record before us, this factor weighed in the defendants' favor as a matter of law. Moreover, the district court did not make a clear finding as to the fourth Bissell factor -- the prejudice associated with the restraint. We, therefore, reverse the district court's decision and remand the case to the district court so that it may recalibrate the

fourth <u>Bissell</u> factor, and then weigh all of the factors together in order to

determine the defendants' entitlement to a post-indictment evidentiary hearing.

**REVERSED and REMANDED.**

TJOFLAT, Circuit Judge, specially concurring:

I agree with the court's decision to reverse and remand, but I write separately because I disagree with the court's rationale for its decision. The court reverses and remands because it holds that the district court misapplied the four factor test from United States v. Bissell.[1] That test, which uses Barker v. Wingo's Sixth Amendment speedy-trial standard to resolve the procedural due process issue this appeal presents, was not necessary to the holding in Bissell and is therefore non-binding dicta. The district court erred in relying on the Bissell test because the test cannot, in my view, be squared with Supreme Court procedural due process precedent.[2] As I shall explain, the court should have resolved this appeal using that Supreme Court precedent rather than the contradictory dicta from our own circuit.

I.

In Bissell, the defendants were indicted for various violations of the federal narcotics laws. Bissell, 866 F.2d at 1347. The grand jury later returned two superceding indictments, containing counts seeking the forfeiture of assets pursuant to 21 U.S.C. § 853. Id. After the superseding indictments were returned, the Government appeared before the district court ex parte and obtained the

---

[1] United States v. Bissell, 866 F.2d 1343 (11th Cir. 1989).

[2] See Barker v. Wingo, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972).

29

issuance of warrants authorizing the Government to seize the assets listed in the forfeiture counts,[3] including the defendants' bank accounts. Id. The Government then executed the warrants and seized the assets. Id. In due course, the case proceeded to trial, and the defendants were convicted. Id. at 1348 & n.2. At sentencing, the assets listed in the forfeiture counts were forfeited to the United States as part of the defendants' sentences.

At no point following the Government's seizure of the defendants' assets did any of the defendants move the district court to quash the warrants or otherwise challenge the validity of the Government's retention of their assets.[4] Id. at 1353. On appeal, for the first time, the defendants challenged "the constitutionality of the

---

[3] The district court issued the warrants pursuant to 21 U.S.C. § 853(f), which states:

(f) Warrant of seizure
    The Government may request the issuance of a warrant authorizing the seizure of property subject to forfeiture under this section in the same manner as provided for a search warrant. If the court determines that there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture and that an order under subsection (e) of this section may not be sufficient to assure the availability of the property for forfeiture, the court shall issue a warrant authorizing the seizure of such property.

(emphasis added). Fed. R. Crim. P. 41 provides the procedure for obtaining a search warrant and, thus, the seizure of property subject to forfeiture. Fed. R. Crim. P. 41(g) provides a procedure for challenging the seizure. See infra note 4.

[4] The defendants could have challenged the seizure of their property in the district court pursuant to Fed. R. Crim. P. 41(g). See supra note 3.

30

ex parte, pretrial restraints on their assets." Id. at 1348.[5] Even in their brief on appeal, the defendants failed to argue that they were entitled to a pretrial, post-restraint hearing.

On its own initiative, however, the court posed the question the defendants had never asked: whether, after issuing the warrants, the district court should have held a pretrial hearing to determine whether the application for the warrants authorizing the seizures was supported by probable cause. The court then answered its own question by stating that under the Sixth Amendment speedy-trial standard of Barker v. Wingo, a pretrial evidentiary hearing was not required.[6] The court's answer constituted pure dicta, as the question was never raised by any party, was unnecessarily injected into the case by the court itself, and was therefore unnecessary to the resolution of the Bissell defendants' appeals.[7]

---

[5] The defendants had waived their challenge to the constitutionality of the ex parte restraints by not presenting it to the district court. See Madu v. U.S. Att'y Gen., 470 F.3d 1362, 1366 n.2 (11th Cir. 2006) ("[A]n argument made for the first time in the court of appeals is generally waived . . . .") (citing Sterling Fin. Inv. Group, Inc. v. Hammer, 393 F.3d 1223, 1226 (11th Cir. 2004)); Mills v. Singletary, 63 F.3d 999, 1008 n.11 (11th Cir. 1995) ("The law in this circuit is clear that arguments not presented in the district court will not be considered for the first time on appeal."); Lancaster v. Newsome, 880 F.2d 362, 371 (11th Cir. 1989); Stephens v. Zant, 716 F.2d 276, 277 (5th Cir. 1983) (per curiam).

[6] Since the court recognized that the defendants had never asked the district court for a hearing, one could interpret its application of the Barker v. Wingo standard as a statement that a district court is required to consider whether to hold a pretrial hearing even though the defendant does not request a hearing. There is no basis for this interpretation.

[7] A reading of the Bissell opinion clearly demonstrates that the court did not entertain the question and answer it under the rubric of the plain error doctrine. See United States v. Evans,

II.

If we acknowledge that <u>Bissell</u>'s discussion of the issue at hand is dicta, we are left with no binding precedent on the question of whether a criminal defendant standing in the Kaleys' shoes is entitled as a matter of due process to a post-restraint hearing prior to trial.[8]  In the absence of binding precedent, the panel should have looked to the general requirements of procedural due process.  <u>See</u> <u>United States v. E-Gold Ltd.</u>, 521 F.3d 411, 415 (D.C. Cir. 2008) (using this approach to determine whether a post-restraint, pretrial hearing was due).  The court's approach today, following the dicta in <u>Bissell</u>, contravenes these principles.

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner'" upon the deprivation of liberty or property.  <u>Mathews v. Eldridge</u>, 424 U.S. 319, 333, 96 S. Ct. 893, 902, 47 L. Ed.

---

478 F.3d 1332, 1338 (11th Cir. 2007) (finding that defendant's due process argument was subject to plain error review because it was not raised before the district court).

[8]  In <u>United States v. Monsanto</u>, 491 U.S. 600, 603–06, 109 S. Ct. 2657, 2660–61, 105 L. Ed. 2d 512 (1989), the Supreme Court explicitly sidestepped this question.  In that case, the Government, <u>ex parte</u>, obtained a pre-trial order restraining the defendant's purportedly forfeitable assets.  The defendant moved to vacate the order, and the district court heard the motion in a four-day evidentiary hearing.  The district court found probable cause for restraining the defendant's assets and thus upheld the order.  The defendant then took an interlocutory appeal, which worked its way to the United States Supreme Court.  The Court upheld the validity of the restraining order, holding that "assets in a defendant's possession may be restrained in the way they were here based on a finding of probable cause to believe that the assets are forfeitable."  <u>Monsanto</u>, 491 U.S. at 615; 109 S. Ct. at 2666.  It declined "to consider whether . . . a hearing was required by the Due Process Clause" because the district court had held an extensive post-restraint hearing on the issue.  <u>Id.</u> at 615 n.10, 109 S. Ct. at 2666 n.10.

32

2d 18 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552, 85 S. Ct. 1187, 1191, 14 L. Ed. 2d 62 (1965)). This basic statement of due process requires different measures in different contexts. Morrissey v. Brewer, 408 U.S. 471, 481, 92 S. Ct. 2593, 2600, 33 L. Ed. 2d 484 (1972) ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands."); Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S. Ct. 652, 657, 94 L. Ed. 865 (1950) (holding that due process requires a hearing "appropriate to the nature of the case"). In any particular context, three factors are relevant to the question of what constitutes a meaningful hearing:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews, 424 U.S. at 335, 96 S. Ct. at 903.

Under ordinary circumstances, the private interest weighs heavily enough to require the government to provide notice and some sort of hearing prior to the deprivation. United States v. James Daniel Good Real Property, 510 U.S. 43, 53, 114 S. Ct. 492, 501, 126 L. Ed. 2d 490 (1993)(civil forfeiture); Fuentes v. Shevin, 407 U.S. 67, 82, 92 S. Ct. 1983, 1994–95, 32 L. Ed. 2d 556 (1972) ("Although . . . due process tolerates variances in the form of a hearing appropriate to the nature of

33

the case, . . . the Court has traditionally insisted that, whatever its form, opportunity for that hearing must be provided before the deprivation at issue takes effect.") (quotation omitted). In Fuentes, for example, the Court struck down a state law that allowed creditors, ex parte, to obtain a prejudgment writ ordering the sheriff to seize a debtor's goods. The law failed because it did not afford the debtor notice and a hearing prior to the seizure. Fuentes, 407 U.S. at 83, 92 S. Ct. at 1995; see also Wolff v. McDonnell, 418 U.S. 539, 557–58, 94 S. Ct. 2963, 2975, 41 L. Ed. 2d 935 (1974) ("[S]ome kind of hearing is required at some time before a person is finally deprived of his property interests."); Connecticut v. Doehr, 501 U.S. 1, 18, 111 S. Ct. 2105, 2116, 115 L.Ed.2d 1 (1991) (requiring prior notice and a hearing in the absence of "exigent circumstance[s]").

In extraordinary situations, notice and a hearing may be postponed until after the deprivation. Good Real Property, 510 U.S. at 53, 114 S. Ct. at 501 ("We tolerate some exceptions to the general rule requiring predeprivation notice and hearing, but only in extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.") (quotations omitted). In Mitchell v. W.T. Grant, 416 U.S. 600, 611, 94 S. Ct. 1895, 1902, 40 L. Ed. 2d 406 (1974), for example, the Court distinguished Fuentes and upheld a statute allowing creditors to sequester the goods of delinquent debtors

34

without affording them prior notice and a hearing. Under the statute in <u>Mitchell</u>, to sequester the goods, a creditor could file an <u>ex parte</u> application with a judge showing that the delinquent debtor had the power to "conceal, dispose of, or waste the property or the revenues therefrom, or remove the property from the parish, during the pendency of the action." <u>Id.</u> at 605, 94 S. Ct. at 1899 (quoting La. Code Civ. Proc. Ann. art. 3571). If satisfied with the showing, the judge would then issue a writ of sequestration. <u>Id.</u> at 605–06; <u>see also</u> <u>Calero-Toledo v. Pearson Yacht Leasing Co.</u>, 416 U.S. 663, 679–80, 94 S. Ct. 2080, 2089–90, 40 L. Ed. 2d 452 (1974) (allowing postponement of notice and a hearing until after the seizure of a yacht in part because pre-seizure notice might have prompted the defendant to destroy, conceal, or remove the property).

If postponed, however, notice and a hearing must be given immediately after the deprivation. <u>See</u> <u>Mitchell</u>, 416 U.S. at 606, 94 S. Ct. at 1899. Under the statute upheld in <u>Mitchell</u>, a creditor could obtain a writ of sequestration based on an <u>ex parte</u> judicial determination, but the debtor, afterwards, could "<u>immediately</u> . . . seek dissolution of the writ." <u>Id.</u> (emphasis added). Similarly, in <u>Barry v. Barchi</u>, 443 U.S. 55, 99 S. Ct. 2642, 61 L. Ed. 2d 365 (1979), the Court struck down a statute allowing the New York State Racing and Wagering Board to postpone notice and a hearing until an unspecified time after the suspension of a horse racing

license.  It held that the provision for delaying the administrative hearing "neither on its face nor as applied in this case, assured a prompt proceeding and prompt disposition of the outstanding issues."  Barchi, 443 U.S. at 66, 99 S. Ct. at 2650.

These constitutional principles are mirrored in the framework of Rule 65 of the Federal Rules of Civil Procedure.  Rule 65 provides that, under ordinary circumstances, courts have discretion to order a certain course of action by issuing a preliminary injunction only after affording the "adverse party" notice and a hearing.[9]  Prior notice and a hearing are required even if the hearing will be duplicative of the issues to be litigated at trial.  See Fed. R. Civ. P. 65(a)(2).

In extraordinary situations, Rule 65, like the Due Process Clause, provides an exception to the general rule of prior notice and a hearing.  Rule 65 provides that a temporary restraining order ("TRO") may be granted without notice, but only if the party requesting the order can offer specific facts clearly showing that "immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition."  Fed. R. Civ. P. 65(b)(1)(A).  TROs

---

[9] In noting the similarities between the due process requirement of a prompt post-restraint hearing and Rule 65, I do not adopt the view that due process necessarily requires Rule 65 compliance.  See United States v. Holy Land Foundation for Relief and Development, 493 F.3d 469, 473–76 (5th Cir. 2007) (en banc); but see United States v. Roth, 912 F.2d 1131, 1133 (9th Cir. 1990) ("[I]n order for a restraining order under [21 U.S.C.] § 853 to be constitutional, the district court must hold a hearing under Rule 65.").  I refer to Rule 65 only to underscore the point that in those exceptional cases where notice and a hearing are delayed until after the restraint occurs, the hearing ought to be conducted as promptly as possible.

36

are "designed to preserve the status quo until there is anopportunity to hold a hearing on the application for a preliminary injunction." 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure: Civil § 2951, at 253 (2d. ed. 1995).

Consistent with due process, Rule 65 requires a prompt post-restraint hearing when a TRO is granted. TROs expire after a fixed period of time set by the court that can be no longer than ten days. Fed. R. Civ. P. 65(b)(2). Immediately after the TRO is granted, therefore, the applicant must move for a preliminary injunction, which requires prior notice and a hearing. Fed R. Civ. P. 65(a); see Fed. R. Civ. P. 65(b)(3). Unless notice and a hearing are afforded within the ten-day period, the TRO will expire.

Congress also recognized these norms in those parts of the criminal forfeiture statute that regulate protective orders entered prior to the return of an indictment, 21 U.S.C. § 853.[10] Before the indictment is returned, § 853 authorizes the court to restrain property only "after notice to persons appearing to have an interest in the property and opportunity for a hearing." § 853(e)(1)(B). At the hearing, before it issues the restraint, the court must determine that "there is a substantial probability that the United States will prevail on the issue of forfeiture."

---

[10] Section 853 speaks to the return of an indictment or the filing of an information. I refer here only to indictments.

§ 853(e)(1)(B)(i).  Section 853, like Rule 65, allows this hearing to be delayed until after the restraint occurs only in exceptional cases.  When an indictment has not yet been returned, the court may enter a temporary restraining order without notice or opportunity for a hearing "if the United States demonstrates that there is probable cause to believe that . . . provision of notice will jeopardize the availability of the property for forfeiture."  § 853(e)(2).  Even in these rare cases, however, the hearing must be held within ten days of the restraint, or the restraint will expire: "[s]uch a temporary order shall expire not more than ten days after the date on which it is entered . . . .  A hearing requested concerning [a TRO] shall be held at the earliest possible time and prior to the expiration of the temporary order."  Id.

In those parts of the criminal forfeiture statute that regulate protective orders entered following the return of an indictment, however, Congress was silent as to whether the defendant is entitled to a post-restraint hearing prior to trial.  See id. § 853(e)(1)(A).  I apply the general due process requirements discussed above to determine that the Constitution requires that such a hearing be held in this context.

## III.

In general, then, once property has been seized or restrained by a court order, the property owner must, at minimum, be given notice of the seizure or restraint and a prompt hearing.  The Government argues for a departure from this

38

general rule in cases like this one, where the court restrains property subject to forfeiture in a criminal case. The Government argues that, in these cases, a hearing on the propriety of the restraint may be delayed until the criminal case comes to trial. To determine whether the Kaleys' case justifies a departure from the general requirement of a prompt post-restraint hearing, I examine the three relevant interests that have been set out by the Supreme Court: (1) the private interest in a prompt hearing, (2) the risk of an erroneous deprivation without a prompt hearing, and (3) the government interest in delaying the hearing until trial. See Mathews v. Eldridge, 424 U.S. 319, 335, 96 S. Ct. 893, 903, 47 L. Ed. 2d 18 (1976) (the "Mathews factors").

First, the Kaleys have a private interest in using their property that is akin to the private interests in Mitchell and Fuentes. In those cases, a creditor alleged an interest in the delinquent debtor's property and wished to freeze that property before the parties' rights could be adjudicated. See Mitchell v. W.T. Grant Co., 416 U.S. 600, 601–02, 94 S. Ct. 1895, 1897, 40 L. Ed. 2d 406 (1974); Fuentes v. Shevin, 407 U.S. 67, 69–70, 92 S. Ct. 1983, 1988–89, 32 L. Ed. 2d 556 (1972) . The only difference here is that the Government, rather than a private creditor, asserts the interest. In both Mitchell and Fuentes, the Court noted that, even

39

though the status of the property was contested, the defendant retained an interest,[11] and due process therefore required a prompt hearing on the propriety of the deprivation.  Mitchell, 416 U.S. at 606–07, 94 S. Ct. at 1899–1900 (holding that a statute entitling the defendant to an immediate hearing following issuance of a writ of sequestration "effect[ed] a constitutional accommodation of the conflicting interests of the parties"); Fuentes, 407 U.S. at 81–82, 92 S. Ct. 1994–95 (holding that the defendant's property interest requires a pre-seizure hearing).

The Kaleys also have an additional private interest in a prompt hearing that is not present in the civil context because, as a result of the protective order, they cannot use their assets to employ their preferred attorneys.  The protective order therefore implicates their Sixth Amendment right to counsel of choice.  The right to counsel of choice, while not absolute, is not satisfied merely because the defendant is able to retain adequate substitute counsel.  It protects a criminal defendant's ability to hire the particular lawyer he prefers.  United States v.

---

[11] Our decision in United States v. Bailey, 419 F.3d 1208 (11th Cir. 2005), further affirms that criminal defendants retain an interest in forfeitable property.  Prior to Bailey, some courts had held that potentially forfeitable assets vest in the government immediately upon commission of the act giving rise to the forfeiture.  Under such a rule, the government takes all right and title to forfeitable assets even before investigation and indictment of the criminal defendant.  Bailey clarified that there is no "unheard-of provision for immediate, undecreed, secret vesting of title in the United States." Bailey, 419 F.3d at 1213 (quoting United States v. 92 Buena Vista Ave., 507 U.S. 111, 134, 113 S. Ct. 1126, 1140, 122 L. Ed. 2d 469 (1993) (Scalia, J. concurring in the judgement)).  Under Bailey, potentially forfeitable assets listed in the forfeiture count do not vest in the government until they are actually forfeited upon conviction or court order.  See id.

Gonzalez-Lopez, 548 U.S. 140, 146, 126 S. Ct. 2557, 2562, 165 L. Ed. 2d 409

(2006) ("[T]he Sixth Amendment right to counsel of choice . . . commands, not

that a trial be fair, but that a particular guarantee of fairness be provided—to wit,

that the accused be defended by the counsel he believes to be best.").  In this case,

therefore, it is irrelevant from a Sixth Amendment point of view that the Kaleys

have $270,000 in unrestrained assets with which to hire less expensive counsel.

What matters is that, without access to the property covered by the protective

order, the Kaleys are unable to retain their preferred attorneys, Howard Srebnick

and Susan Van Dusen.

Delaying the due process hearing until trial will only temporarily deprive the

Kaleys of their property rights, but it will completely eviscerate their right to

counsel of choice.  After the verdict is handed down, of course, the Kaleys will no

longer need to retain Srebnick and Van Dusen.  "While the [Sixth Amendment]

deprivation is nominally temporary, it is 'in that respect effectively a permanent

one.'  'The defendant needs the attorney now if the attorney is to do him any

good.'"  United States v. E-Gold, Ltd., 521 F.3d 411, 417–18 (D.C. Cir. 2008)

(quoting United States v. Monsanto, 924 F.2d 1186, 1193 (2d. Cir. 1991) (en

banc); and United States v. Moya-Gomez, 860 F.2d 706, 726 (7th Cir. 1988))

(emphasis in original).  The Sixth Amendment interest, for that reason, weighs

41

heavily in the balance.

I next analyze the second factor, the risk of an erroneous deprivation without an immediate hearing. In this case, prosecutorial incentives increase the likelihood of an erroneous deprivation in the absence of a prompt hearing. A prosecutor has everything to gain by restraining assets that ultimately may not be forfeited. By doing so, he can stack the deck in the government's favor by crippling the defendant's ability to afford high-quality counsel. If the prosecutor can delay judicial oversight of the restraint until trial, he also has nothing to lose, as he does not have to dedicate any extra resources to defending his decision.

Also relevant to the risk of an erroneous deprivation is "the probable value, if any, of additional or substitute procedural safeguards." Mathews, 424 U.S. at 335, 96 S. Ct. at 903. In this case, without a prompt hearing, probable cause rests, initially, on the grand jury having found probable cause before returning the indictment and, then, on the district court's finding of probable cause, both of which findings were made on the Government's ex parte showing.[12] Neither procedure significantly reduced the risk of an erroneous deprivation. In grand jury proceedings, the government may rely, even entirely, on "read-backs and hearsay

_____

[12] In some cases, the court may treat the indictment, standing alone, as establishing probable cause. The magistrate judge did that here. It was only after the Kaleys moved the court to vacate the protective order that the magistrate judge required the prosecutor to present, in camera, independent proof of probable cause.

42

witnesses," United States v. Waldon, 363 F.3d 1103, 1109 (11th Cir. 2004) (per curiam), or illegally acquired evidence, United States v. Calandra, 414 U.S. 338, 344–45, 354–55, 94 S. Ct. 613, 618, 623, 38 L. Ed. 2d 561 (1974).[13]  The government has no duty to disclose exculpatory evidence to the grand jury, United States v. Williams, 504 U.S. 36, 112 S. Ct. 1735, 118 L. Ed. 2d 352 (1992), and the defendant has no right to testify or even appear, see Fed. R. Crim. P. 6(d)(1).  The grand jury, then, is not a mechanism well designed to protect a defendant against an erroneous deprivation.

The district court's finding is slightly more reliable than the grand jury's.  It was, however, made upon an ex parte showing; the Kaleys had no opportunity to challenge the Government's showing.  In this sense, the court's probable cause finding is comparable to the ex parte judicial determination in Mitchell.  See Mitchell, 416 U.S. at 606, 94 S. Ct. at 1899 (describing a statute that allowed a judge to issue a writ of sequestration upon a creditor's ex parte application).  Here, as in that case, the ex parte determination is insufficient to justify delaying the post-restraint hearing for long after the restraint is imposed.  See id. at 618, 94 S. Ct. at 1905 (stressing that, after the deprivation, the debtor is entitled to an immediate hearing).

---

[13]  The government may even rely on testimony that turns out to be perjured.  See Anderson v. Sec'y for the Dep't. of Corr., 462 F.3d 1319, 1326–27 (11th Cir. 2006) (per curiam).

Finally, I examine the Government's interest. Citing the legislative history

of the forfeiture statute, the Government asserts that:

> requiring the government to prove the merits of the underlying criminal case and forfeiture pretrial would make obtaining a restraining order too difficult and would make pursuing such an order inadvisable from the government's standpoint because of the potential for damaging premature disclosure of the government's case and trial strategy, as well as jeopardizing the safety of witnesses and victims.

Gov't. Br. at 31. Although these are certainly legitimate interests, the Government

overlooks the fact that the party challenging the restraint bears the burden of

convincing the court that probable cause is lacking. This is true whether the

defendants challenge a seizure made pursuant to a § 853(f) warrant via a motion

filed pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure, as they

could have in Bissell, or a restraint affected pursuant to a § 853(e) protective order

via a motion to vacate the order.

The Mathews factors, on balance, do not justify an exception to the settled

minimum due process requirement of a prompt post-restraint hearing.

Accordingly, the Kaleys are entitled to a pretrial hearing on the merits of the

protective order.[14] This court should therefore have reversed and remanded to the

---

[14] The majority of our sister circuits that have considered the issue are in accord. See E-Gold, 521 F.3d at 419 (requiring a post-restraint, pretrial hearing when the defendant needs the assets to meaningfully exercise the right to counsel); Monsanto, 924 F.2d at 1203 (same); Moya-Gomez, 860 F.2d at 728–29 (same); United States v. Lewis, 759 F.2d 1316, 1324–25 (8th Cir. 1985) (same with respect to restraining orders issued pursuant to 21 U.S.C. § 848); United States v. Crozier, 777 F.2d 1376, 1383–84 (9th Cir. 1985) (noting due process requirement of a post-

district court with instructions to afford the Kaleys a pretrial hearing at which they could show that the Government did not have probable cause to restraint their assets.  Because the court mistakenly believes that it is bound by Bissell, however, the Kaleys may be deprived of this right.  For these reasons, I specially concur.

---

restraint hearing in cases involving § 853 orders); see also United States v. Melrose East Subdivision, 357 F.3d 493, 499 (5th Cir. 2004) (noting the "broad agreement that due process requires the district court to hold a prompt hearing at which the property owner can contest the restraining order—without waiting until trial to do so—at least when the restrained assets are needed to pay for an attorney"); cf. United States v. Long, 654 F.2d 911, 915 (3rd Cir. 1981)(rejecting due process challenge to restraining order issued pursuant to § 848 where order issued after hearing);  United States v. Farmer, 274 F.3d 800, 803, 805–06 (4th Cir. 2001)(requiring a post-restraint, pretrial hearing but only where the defendant shows the restrained assets are untainted and necessary to secure counsel of choice); United States v. Jones, 160 F.3d 641, 647 (10th Cir. 1998)(same).